UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, AFL–CIO, an unincorporated association, Plaintiff,

v.

GREAT AMERICAN INDUSTRIES, INC., Linear, Inc., Rubatex Corp., and Rubatex Holding Corp., Defendants.

No. 72 Civ. 3269 (KTD).

United States District Court,
S. D. New York.

Sept. 20, 1979.

Auerbach & Labes, New York City, for plaintiff; Stanley W. Taylor, William Auerbach, New York City, of counsel.

Stolz, Goldfine & Stolz, New York City, for defendants; Irving H. Stolz, Ernest Swiedler, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This diversity action was commenced in 1972 by United Rubber, Cork, Linoleum and Plastic Workers of America [hereinafter referred to as "United Rubber"] representing the members of its former Local 204 who, until July 14, 1967, were employed by the defendant Linear, Inc. [hereinafter referred to as "Linear"]. Plaintiff charges Linear with numerous violations of a Collective Bargaining Agreement [hereinafter referred to as "the Bargaining Agreement"], to which Local 204 and Linear were parties. The complaint also names as co-defendants Linear's parent corporation, Great American Industries, Inc. [hereinafter referred to as "Great American"], together with two of Great American's wholly-owned subsidiaries, the Rubatex Corporation [hereinafter referred to as "Rubatex"], and the Rubatex Holding Corporation [hereinafter referred to as "Rubatex Holding"]. While the latter three co-defendants admittedly were not parties to the Bargaining Agreement, plaintiff, under numerous theories, seeks to impute Linear's liability under that Bargaining Agreement to these separate, *albeit* related, corporations.

This case was the subject of a 15 day bench trial before the late Frederick van Pelt Bryan, District Judge, in the latter part of 1976. Judge Bryan, however, passed away before rendering a decision and following his death the case was assigned to me. Thereafter, in November 1978, the parties entered into a stipulation which provided, in essence, that rather than retrying the case, they would submit the case to me for a decision based upon the trial transcript, all the exhibits received into evidence by Judge Bryan and the various pre and post-trial memoranda submitted by the parties. In addition, the parties requested, and were granted, the opportunity to present a summation-type argument to the Court in order to extract the most relevant testimony, exhibits and arguments from the voluminous documents generated by this action.

## BACKGROUND OF THE ACTION

During the period relevant to the instant action, Great American was involved in a wide variety of business enterprises. These included the manufacture of various rubber component products for the automotive, aircraft and sporting goods industries, and the manufacture and distribution of finished

sporting goods, food products and construction materials. Great American conducted its myriad of business activities through a complex of wholly-owned subsidiaries. *See, e. g.*, Trial Exhibits 1–8, [hereinafter referred to as "Tr. Ex."]. Great American's rubber manufacturing interests were quite profitably conducted through the efforts of Rubatex which, prior to October, 1962, was a division of Great American. Given Rubatex's financial success, Great American decided in 1961 to expand its interests in the rubber industry and acquired all the common stock of Linear, a rubber concern located in Dallas, Pennsylvania.[1] While Linear, like Rubatex, was engaged in the manufacture and distribution of specialized rubber products, its products were not duplicative of those produced by Rubatex and consequently appealed to a different product market.

Prior to the acquisition, Linear had been something less than a profitable enterprise. In an effort to revive the severely distressed rubber concern, Great American expended vast sums in 1961 and 1962. Finally, in late December, 1962, after advancing to Linear over $700,000, Great American determined that it could no longer carry these sizable advances on its books. Having made these advances, however, Great American was unwilling to sell Linear to a purchaser outside the Great American complex. Consequently, it looked to Rubatex as the logical purchaser. Indeed, Rubatex was its very successful subsidiary in the rubber industry and if the business were at all salvageable, Rubatex had the requisite expertise and ready capital. Thus, in December 1962, Great American transferred its total investment in Linear to Rubatex.[2]

Pre-Trial Order at ¶ 7, [hereinafter referred to as "P.T.O."].

After the transfer, Rubatex began where Great American had left off by continuing to pump funds into Linear. In order to maintain Linear as a viable enterprise, Rubatex was required to make substantial advances either directly to Linear or to its creditors. These advances continued from January, 1963 through September, 1966—the bulk of which occurred in 1965 and 1966.

Finally, on July 14, 1967, Linear—perennially plagued by financial woes and the recent victim of a prolonged labor dispute—terminated its manufacturing operations. This action, however, is not grounded in the financial decline of Linear, the reasons underlying its shutdown or even about its labor problems. Rather, the crux of the instant suit is Linear's Bargaining Agreement with United Rubber's affiliate Local 204.[3] In particular, the central issue is what effect, if any, the linear shutdown had upon the most recent Bargaining Agreement executed by Linear and Local 204 just three months prior to the shutdown.

## I. *The Bargaining Agreement*

For many years Linear and Local 204 had been parties to successive collective bargaining agreements. P.T.O. ¶ 3. Over the years the Bargaining Agreement underwent various modifications and amendments to reflect the increasingly complex relationship between employer and employee. While the earlier agreements focused primarily upon wages and working conditions, the later agreements came to include a wide variety

1. Between 1961 and 1964, Great American also managed to acquire the vast bulk of the outstanding preferred shares of Linear. In any event, after 1961 Great American reported Linear's operations as part of its consolidated statement. See Tr. Ex. 1–7.

2. In addition to the $700,000 in advances to Linear, this investment consisted of $199,000 in a capital account and, of course, all the Linear shares which had been purchased by Great American. It is also of interest to note that prior to October, 1962, Rubatex had been a mere division of Great American. It was not

until two months before Great American transferred Linear to Rubatex that it was set up as a wholly-owned subsidiary of Great American with an independent corporate existence.

3. It is clear that only Local 204 was a party to the Bargaining Agreement in issue. However, as more fully discussed below, United Rubber, the International Union of which Local 204 was an affiliate, is the proper party to prosecute this action having succeeded to all of Local 204's rights under the Bargaining Agreement.

of employee benefits including incentives, life insurance, hospitalization, pension and severance awards.

The last Bargaining Agreement to run its full term expired on July 30, 1966. Thereafter, all manufacturing operations at Linear ceased when the parties failed to renew the Agreement. This work stoppage [4] continued from August 1, 1966 through April 12, 1967 at which time the parties renewed the Bargaining Agreement for a term to expire on April 14, 1971.[5] P.T.O. ¶ 15.

Linear resumed operations in April, 1967 on a reduced basis. Only 98 of the 264 individuals employed in July, 1966 were recalled by the management. Finally, after a brief and unsuccessful attempt to recapture that portion of the market it held prior to the work stoppage, Linear terminated its operations in July, 1967.

Following the plant closing the liquidation of Linear commenced. The first occurrence was a filing by Local 204 of certain grievances for final and binding arbitration with the American Arbitration Association pursuant to the terms of the Bargaining Agreement. Tr. Ex. 53. These grievances charged, in essence, that Linear had failed to meet its obligations under the Bargaining Agreement with respect to a host of employee benefits. For reasons not made clear at trial, Local 204 abandoned the arbitration procedures set forth in the Bargaining Agreement and consequently never obtained a final resolution. P.T.O. ¶¶ 19, 20, 29.

Apparently the next step taken by the Union was to initiate an amended charge of unfair labor practice against Linear with the National Labor Relations Board. Tr. Ex. 77. The end result of these procedures, including an appeal to the General Counsel of the National Labor Relations Board, was a withdrawal of the charges based in part on the following findings:

(1) The shutdown of the Linear plant was lawful Tr. Ex. 80;

(2) [T]he Employer has indicated its willingness to meet with the Union at any time to discuss the effects of termination [on employees] Tr. Ex. 80;

(3) [T]he Company had informed [two Union officials] on July 14 [1967] that the shutdown would be permanent . . . . Tr. Ex. 82; *but see* Tr.Ex. 86; and

(4) Although the Employer deemed it futile to proceed to arbitration in lieu of its financial condition the Union could have invoked arbitration. Tr. Ex. 80.

In addition, quite apart from the arbitration procedures, by letter dated November 17, 1967 George Spohrer, Linear's local Pennsylvania attorney, informed the Union's legal representative that Linear was willing "to discuss the effects and the implications of the shutdown as it effects the rights of Union employees." Tr. Ex. 58. Mr. Spohrer went on to say that although there was "little point in pressing pending arbitration cases having to do with work rules . . . [c]oncerning the other arbitration cases having to do with vacation pays and other matters which are contractually due, it has always been our position that we do not propose to defend these honest claims." *Id.* The letter continues:

The Company has always taken the position that whatever is contractually due its employees under the terms of pre-existing bargaining contracts are valid, legal obligations. There seems little point in arbitrating what is clearly due. The problem is, of course, that Linear has no

---

4. There is some dispute as to whether this *work stoppage was actually a strike* by Linear employees or a lockout by the Linear management. See P.T.O. at ¶ 14. I find, based upon the evidence before me, that the work stoppage was a strike and will be construed as such for purposes of this opinion.

5. In September, 1966, while in the midst of the work stoppage, Linear executed a series of fi-

nancial agreements which in essence secured all of Rubatex's prior advances to Linear against the Linear plant and all the assets therein. While of little importance insofar as Linear's primary liability to Local 204 is concerned, it is of critical importance in defining Local 204's rights vis-a-vis the Great American corporate complex.

assets of any kind against which any of these sums could be paid.

Again, we stand ready to meet with you at any time in order to discuss any of these matters. As you know, Linear is completely insolvent, and all of its assets have been transferred in order to partially meet the obligations of secured creditors.

The apparent willingness of Linear to sit down with the Union and discuss the effects of the shutdown was again the subject of a letter by Mr. Spohrer to the Union's counsel dated June 19, 1968. Spohrer stated that although all of Linear's books and records had been shipped from the Dallas plant for storage elsewhere, he stood ready to respond to any specific inquiries of the Union concerning pension and other employee benefits. Tr. Ex. 62. It does not appear, however, that the Union ever accepted Spohrer's invitation concerning specific inquiries as to the various employee benefits.

Meanwhile, in August 1967, Rubatex formed a wholly-owned subsidiary called Rubatex Holding for the specific purpose of taking title to the Linear plant and other assets which were the subject of a note, mortgage and financing statement [hereinafter collectively referred to as the "security agreements"] held by Rubatex and executed by Linear in September, 1966. P.T.O. ¶¶ 21, 22. This was done in lieu of Rubatex commencing an expensive and time consuming foreclosure action upon the security agreements. Thereafter, Linear conveyed its plant and other assets to Rubatex Holding. P.T.O. ¶ 23. From 1967 until the latter part of 1969, Rubatex Holding disposed of the assets formerly held by Linear. It appears that these assets were first applied to Linear's business obligations outside the Great American complex and only then were applied to reduce Linear's debt to Rubatex.

Local 204 never directly attacked the validity of the security agreements upon which the sale of Linear's assets in lieu of foreclosure was premised. Nor did the Union ever file an involuntary bankruptcy for the insolvent Linear. It was not until October, 1972 that United Rubber decided to attack the manner in which Rubatex Holding disposed of Linear's assets charging for the first time that Local 204 was short changed in the bargain.

Plaintiff seeks herein to collect the wages and benefits due its various members under the terms of the Bargaining Agreement executed by Linear and Local 204 on April 15, 1967. In particular, the Union claims that its members are entitled to:

(a) Unpaid vacation pay for 1966;

(b) Unpaid vacation pay for 1967;

(c) Unpaid contributions to an employee Supplemental Unemployment Benefits Fund [hereinafter "SUB"] for 1966;

(d) Unpaid contributions to SUB for 1967;

(e) Unpaid premiums for Blue Cross—Blue Shield insurance coverage and certain life insurance and hospitalization benefits; and

(f) Pension and/or Severance benefits on behalf of those members for whom these benefits had vested at the time Linear shutdown.

The case at bar presents three quite distinct central issues. The threshold issue is whether United Rubber has standing to maintain the instant suit on behalf of the members of the now defunct Local 204. Next, assuming United Rubber is the proper party to prosecute the instant suit, the issue is whether Linear is liable for some or all of its obligations under the Bargaining Agreement after it permanently terminated all manufacturing operations in July, 1967. Finally, to the extent Linear may be liable under the Bargaining Agreement and given its present financial inability to meet these obligations, was the conduct of Great American, Rubatex and Rubatex Holding in the operation and ultimate liquidation of Linear such as to require these related corporations to satisfy Linear's labor obligations.

## II. Choice of Law

Before addressing each of the issues delineated above, I turn briefly to the ques-

tion of what body of substantive law shall govern these issues. Despite the voluminous memoranda and extensive arguments addressing the issues at bar, the parties have summarily decided that Pennsylvania Law (as the place of Linear's incorporation and its principal place of business) shall govern all issues raised in this diversity action. In part, I must disagree.

There are two categories of issues raised by plaintiff which must be distinguished for purposes of determining the applicable law. First, plaintiff charges that Linear breached its Bargaining Agreement with Local 204 by failing to meet its financial obligations arising thereunder. Second, the Union urges that the monies owed its members under the Bargaining Agreement constitute wages and were entitled to a priority in the course of distributing Linear's assets upon its demise. Despite this preferred status, however, the Union charges that the sum total of Linear's assets were fraudulently conveyed and/or converted by Great American through the efforts of Rubatex and Rubatex Holding solely for their benefit.[6]

■ Turning first to the alleged breach of the Bargaining Agreement, it is now settled that given the enactment of the Labor-Management Relations Act (29 U.S.C. §§ 141 *et seq.*) federal substantive law must govern its adjudication. *Republic Steel v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Indeed, this is true even where, as in the case at bar, a claim arising out of a breach of a collective bargaining agreement is couched in terms of a common law contract action. *Papadopoulos v. Sheraton Park Hotel,* 410 F.Supp. 217, 219 (D.C. Cir. 1976). Thus, while plain-

tiff chose to ignore the jurisdictional predicate set forth in the Labor-Management Relations Act (29 U.S.C. § 185), this does not alter the application of federal law.[7] *Id.* at 219.

■ As to plaintiff's allegation that Linear's assets were fraudulently conveyed and/or converted by the Great American complex for its own benefit and at the expense of Local 204, a different result obtains. Jurisdiction in this action was grounded by plaintiff, both in its original and amended complaint, solely upon diversity of citizenship. Accordingly, the settled rule is that in determining which substantive law will apply, a federal court will look to the choice of law provisions of the forum. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rosenthal v. Warren,* 475 F.2d 438, 440 (2d Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973). Whether the alleged fraudulent conveyances/conversions are viewed as essentially contractual in that they arose out of the Bargaining Agreement or simply tortious in nature, the result is the same. New York will apply the law of that state with the most significant contacts. *See, e. g., Intercontinental Planning Ltd. v. Daystrom,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969) (Contracts); *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (Torts).

■ It is quite evident that in the instant action Pennsylvania is the state with the most significant contacts and its substantive law should be applied. Pennsylvania

---

**6.** Although Linear's assets were admittedly first applied to extinguish its trade debts, plaintiff argues that this too inured to the benefit of the Great American complex. It urges that these creditors were also creditors of Great American, Rubatex and many of the Great American subsidiaries and consequently, it was incumbent upon Great American to remain on good terms with these creditors. Accordingly, Great American made sure these creditors were satisfied.

**7.** It is clear that plaintiff relies solely upon diversity jurisdiction in the case at bar. How-

ever, it has not totally ignored the Labor-Management Relations Act. In its complaint plaintiff states:

Plaintiff International Union is, and at all times material hereto was, an unincorporated labor organization representing employees in an industry affecting interstate commerce, as defined in the National Labor Relations Act, as amended, and the Labor-Management Relations Act of 1947.

For some inexplicable reason, plaintiff has chosen to ignore the Acts' jurisdictional predicate and yet expressly define itself within its terms.

serves not only as the state in which Linear was incorporated,[8] the Linear plant was located and the Bargaining Agreement was executed, but it is also the state in which Linear's assets were located in July, 1967 and where the assets, *arguendo*, were fraudulently disposed of by the Great American corporate family. Accordingly, save the Bargaining Agreement and any liability thereunder, all issues will be determined by reference to Pennsylvania Law.

### III. *Standing*

■ While defendants do not contend that United Rubber lacks the capacity to represent its members in a suit arising out of a Bargaining Agreement, they do argue that since plaintiff has, to date, failed to specifically identify those members of Local 204 it represents in this action, it is not the proper party to prosecute the particular claims raised herein. In particular, defendants argue that the rights United Rubber seeks to vindicate are inherently personal to the individual members of Local 204. Accordingly, they urge that the action should have been maintained as a class action, providing each member of Local 204 with notice of the pending action [9] and an opportunity to opt in or out of the class. Alternatively, they urge that the members of Local 204 should have commenced individual suits on their several claims.[10] Moreover, defendants urge that since many of the claims herein are keyed upon the number of years a particular individual was employed at Linear or the aggregate number of hours worked by an employee in a particular year, it is impossible for this Court to fashion any relief without the presence of the individual

members either personally or through a class representative. I find none of these arguments persuasive and conclude that United Rubber, as Local 204's successor, is the proper party to prosecute this suit.

Section 301 of the Labor-Management Relations Act, 29 U.S.C. §§ 141 *et seq.*, provides in pertinent part:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States.

Nowhere does Section 301 require that a Union commence a suit on behalf of its members as a class action. On the contrary, the provision expressly authorizes the Union to sue *as an entity* on behalf of the employees it represents. *See, e. g., Auto Workers v. Hoosier Corp.*, 383 U.S. 696, 699–700, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). This is equally true where the Union seeks to vindicate the individual rights

---

**8.** While there is no doubt that Linear no longer operates as a viable business entity, its corporate existence survives even today. P.T.O. at ¶ 27.

**9.** Defendants' reliance upon individual notice of the pendency of a class action is misplaced. Rule 23 of the Federal Rules of Civil Procedure does not require individual notice in all cases. Rather, the standard in some cases is the best notice practicable.

**10.** Concerning the feasibility of individual suits, defendants charge that many individual mem-

bers have reached extra judicial agreements with Linear concerning severance, pension and other employee benefits which are the subject of the instant suit and many of these agreements conflict with the claims urged herein. Suffice it to say that where a Union member has individually pressed his claim under the Bargaining Agreement he will not be affected by this suit. This suit was brought on behalf of those individuals who did not individually prosecute actions against Linear or the other defendants named herein.

of its members under a collective bargaining agreement. *Smith v. Evening News Association,* 371 U.S. 195, 198–200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Indeed, in *Smith* the Court held that "[t]o exclude [individual claims] from the ambit of Section 301 would stultify the Congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." *Id.* at 200, 83 S.Ct. at 270.

■ Finally, the computation of individual claims which are keyed upon the number of years employed or the aggregate number of hours worked is a question of damages. This issue will be fully dealt with below. Suffice it to say at this juncture that whether the plaintiff can prove with reasonable certainty the amount due each of its members is irrelevant insofar as its standing to prosecute the suit is concerned.

## IV. *Linear's Liability*

As previously mentioned, the last Bargaining Agreement between Local 204 and Linear to run full term expired in July, 1966. Finally, after a nine month work stoppage, the parties agreed to renew the Agreement in April, 1967. As renewed, the Bargaining Agreement was to run through April 14, 1971 and contained the following provisions which are the subject of the instant suit:

(a) Paid vacations for those Linear employees who met certain minimum requirements;

(b) Supplemental unemployment benefits;

(c) Blue Cross—Blue Shield coverage and disability benefits; and

(d) Pension and Severance benefits.

### (A) 1966 Vacation Pay

United Rubber claims that Linear owes various members of Local 204 a total of $52,000 which represents that vacation pay earned by its members prior to the work stoppage in July, 1966, but never paid by Linear thereafter. This claim was also the subject of a grievance, filed January 4, 1967, upon which the Union sought arbitration. In response to the grievance, however, Linear, through its attorney, stated to Local 204 that:

the company is not contesting the right of employees to vacation pays which were earned prior to the work stoppage July 30, 1966. We consider all vacation pay earned prior to this date to be valid and subsisting obligations of the company.

The letter continues:

Accordingly, there is no necessity for the arbitration case involving this matter . . . .. We hope you will inform the American Arbitration Association that this matter has been withdrawn. Tr. Ex. 85.

This admission was renewed by Linear in the Bargaining Agreement executed on April 15, 1967 which provides:

The Management recognizes its legal obligations to pay accrued vacation payments for the year 1966 as soon as possible. . . . Tr. Ex. 53 at ¶ 5 of signature page.

Linear now attacks the claim on two grounds. First, it charges that the claim for 1966 vacation pay is barred by the applicable statute of limitations. Second, it attacks the claim on the ground that the plaintiff failed to prove the precise amount of vacation pay due and owing its members on July 30, 1966.

■ It is clear that the timeliness of an action alleging a breach of a collective bargaining agreement is to be determined "as a matter of federal law," by reference to the forum state's statute of limitations together with any applicable tolling provisions. *Auto Workers v. Hoosier Corp., supra,* 383 U.S. at 704–05, 86 S.Ct. at 1113. New York, as the forum state, provides that an action upon a contract must be commenced within 6 years from the date the claim arises. N.Y.Civ.Prac.Law § 213(2) (McKinney 1972).

Linear, applying the above period of limitation, argues that the claim for 1966 vacation pay accrued at the very latest as of July 30, 1966. This is the date upon which

the Bargaining Agreement expired and the nine-month work stoppage began. Tr. Ex. 53. Linear reasons that since this was the last day in 1966 that any employees worked, all vacation pay for the year was due and computable as of that date and the claim had accrued. The defendants' argument concludes that since this action was not commenced until October 1972, the claim for 1966 vacation pay is untimely. I disagree.

■ Assuming, without deciding, that the claim for vacation pay did accrue as of July 30, 1966,[11] the statute of limitation would still not act as a bar to recovery under either of two theories. First, section 17–101 of the General Obligations Law provides that "[a]n acknowledgment or promise contained in a writing signed by the party to be charged" acts to revive the statutory period and extend an obligor's liability for another six years. N.Y.Gen. Oblig.Law § 17–101 (McKinney 1978). Linear made two such acknowledgments: one, in its letter to Local 204 dated March 13, 1967, (Tr. Ex. 85), and the other in the Bargaining Agreement itself. (Tr. Ex. 53 at ¶ 5 of signature page). Thus, the action was well within this revived statutory period.[12]

Second, quite apart from the provisions of section 17–101 cited above, Linear's letter of March 13, 1967 is sufficient to estop Linear from now seeking refuge behind the statute of limitations. Indeed, the letter admitted liability for the vacation pay and successfully requested that Local 204 withdraw its arbitration grievance. Since Local 204 reasonably relied, to its detriment, upon Linear's acknowledgment of its obligation in withdrawing its arbitration grievance which, if pursued, would have led to a final and binding resolution, estoppel is warranted.

Turning finally to the amount of damages claimed by plaintiff, I find that under all the circumstances, plaintiff offered sufficient evidence at trial from which a reasonable approximation of the vacation pay due its members could be calculated.

■ It is clear that an award of damages may not be premised upon mere speculation or guesswork. *James Wood General Trading Establishment v. Coe,* 297 F.2d 651 (2d Cir. 1961). It is equally clear, however, that once a plaintiff has demonstrated that he has been damaged, he need only demonstrate the amount of damages with reasonable certainty, *W. L. Hailey & Co. v. Niagara County,* 388 F.2d 746 (2d Cir. 1967), and a wrongdoer has no right to insist upon a mathematically precise evaluation of the damages suffered. *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926–27 (2d Cir. 1977).

■ There is no question that Local 204 has demonstrated its entitlement to 1966 vacation pay. Indeed, the "defenses" offered by Linear do not attack the merits of the claim itself. Rather, Linear attempts to set up the statute of limitations and plaintiff's "imprecise" calculation of damages to bar the recovery of an otherwise meritorious claim. Moreover, insofar as the precise

---

**11.** It is true that the statute of limitation in the case at bar did not toll until October, 1972. However, under the terms of the Bargaining Agreement, it could be argued that the claim for 1966 vacation pay did not finally accrue until December, 1966. The Agreement provides at Article V Section 5 that:

> Vacation may be taken at any time during the year . . . ." Tr. Ex. 53.

There is no indication in the Agreement that an employee was prohibited from taking previously earned vacation time during the course of a work stoppage. That is to say, an employee entitled to a week vacation could designate one week in a month long strike as his vacation period. Thus, it would appear that those employees entitled to a paid vacation as of July, 1966, were eligible to take this vacation time through December, 1966. Under such an interpretation an employee's claim for 1966 vacation pay would not finally accrue, for statute of limitation purposes, until December, 1966 and the commencement of this suit in October, 1972, would be within the statutory period. In light of my finding, however, I need not determine when the statutory period commenced.

**12.** This is true despite the fact that the acknowledgment was made after the original statutory period had run. *See Jones v. Jones,* 242 F.Supp. 979, 982 (S.D.N.Y.1965).

computation of damages is concerned plaintiff offered the testimony of George Marsden, President and Bargaining Representative of Local 204. Marsden, by consulting various seniority lists, was able to compute the amount of vacation pay due the members of Local 204 as of July 30, 1966, Trial Transcript at 103–04 [hereinafter referred to as "Tr."], which he found to be $52,000. Since under the terms of the Bargaining Agreement these seniority lists were to be kept current by Linear (Tr. Ex. 57 § 7.2), and were properly authenticated at trial (Tr. at 121–33; 2166–67), they were clearly a reasonable and accurate basis upon which to make the instant computations. Suffice it to say that under the circumstances the plaintiff offered the best evidence available concerning the computation of damages.

Furthermore, this same figure was reflected in the grievance filed by Local 204 in January 1967 to which Linear made no objection in its letter of March, 1967 and in which Linear admitted its liability. *See* Tr. Ex. 85. I find that this response, in the face of the $52,000 figure asserted by Local 204, was tantamount to an admission of the amount as well as the computations upon which it was premised.

■ Linear blames the absence of any contrary evidence concerning this as well as the other claims asserted herein on the fact that after the cessation of operations at the Dallas, Pennsylvania plant, all its books and records were destroyed. While I need not pass upon the merits of Linear's explanation, it is sufficient to note that even if true, this excuse does not in and of itself vitiate plaintiff's claims for damages or its computations thereof.[13] Indeed, Linear could have offered the testimony of those persons familiar with its record entries insofar as the Union was concerned. Or at the very least, the defendant could have offered an alternative method of computation. Failing this, however, defendant cannot now seek a precise computation of plaintiff's damages in an effort to subvert otherwise meritorious claims.[14]

### (B) 1967 Vacation Pay

The Union also seeks 1967 vacation pay for those members of Local 204 who were rehired by Linear in April, 1967 and who worked for at least 30 days as provided under the terms of the Bargaining Agreement. United Rubber has computed this claim to be $29,339.20. *See* Tr. Ex. 150. In addition, the Union seeks 1967 vacation pay for the balance of the work force who, although not recalled to work in April, 1967, are, under the Union's interpretation of the Bargaining Agreement, entitled to vacation pay totaling $37,464. See Tr. Exs. 150, 109.

■ Linear does not contest its liability for vacation pay to those workers rehired in 1967. Rather, it simply attacks plaintiff's calculations of damages as rank speculation. Once again, however, Linear offers neither contrary evidence concerning vacation pay nor an alternative method of computation. Since Linear has admitted liability for those rehired, it cannot defeat a recovery merely

---

**13.** It appears that as late as June, 1968, at least Linear's counsel knew the location of Linear's books and records. Indeed, by letter dated June 19, 1968, Linear's local counsel, George Spohrer, wrote the following to Local 204's counsel:

> Unfortunately, the office of Linear in Dallas has long since been closed, and all records have been transferred to storage. However, if you would write me concerning your specific inquiries concerning any employee, I would certainly make an attempt to supply you with the necessary information. Tr. Ex. 62.

**14.** Indeed, addressing the issue of damages the following colloquy occurred between the Trial Judge and counsel for defendants:

> MR. SWIFDLER: Let me say this, your Honor: there is no question that they owed something once the plant opened up. I wasn't really disputing what Mr. Marsden testified about that $900, whatever it was. I am talking about the earlier amount. There is no question that they owed some SUB money from that point on. So far as I know there is nothing that I have ever seen that they owed anything for any prior period.
>
> THE COURT: Well, it seems to me you, having no books, it is a very serious burden on you. Tr. at 1783.

While the above deals specifically with only one of the claims asserted herein, the observation of Judge Bryan applies equally to each claim.

by insisting upon a precise computation of damages. *Contemporary Mission, Inc. v. Famous Music Corp., supra,* at 926–27. Indeed, "the burden of uncertainty as to the amount of damages is upon the wrongdoer." *Id.* at 926. *See also Perma Research & Development v. Singer Co.,* 542 F.2d 111, 116 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976). Moreover, the plaintiff did offer a computation of 1967 vacation pay for those rehired in 1967 based upon Union seniority lists. From these lists it was established that based upon job classifications these employees were entitled to $29,339.20. Tr. Ex. 150. Since defendants have neither offered any computations to the contrary nor attacked the general reliability of the plaintiff's computations, I find these computations to be reasonably certain and recoverable.

Concerning the Union's claim for 1967 vacation pay for those members who were never recalled by Linear—a different analysis yields an identical result. The Bargaining Agreement provides that "[e]mployees with more than six (6) months [continuous] service with the company shall be entitled to a vacation each year . . .." Tr. Ex. 53 at Article 5 § 5.0. The Agreement goes on to define continuous service as "service for at least 30 working days during the twelve month period preceding the vacation period for each of the years of continuous service." *Id.*

Under the plain terms of the Bargaining Agreement, therefore, in order for an employee to be eligible for any 1967 vacation pay he must have logged at least 6 months service at Linear prior to April 1967 and have worked at least 30 days of this 6 month period in the year preceding the vacation period; to wit, in 1966.

Linear attacks this interpretation of the Bargaining Agreement based upon a re-typed version of the Agreement prepared by Linear's local Pennsylvania counsel—George Spohrer. This version provides that continuous service shall constitute "service for at least thirty (30) working days during the twelve month period preceding the vacation period for each of the years of con-

tinuous service. It is agreed that the exception to this will be the year 1967. In 1967 employees will work thirty (30) days before applying for vacation." Tr. Ex. 54.

Under this version, it is clear that before a claim for 1967 vacation pay could be made, an employee would have to work for 30 days in the year 1967. Plaintiff, however, quite correctly questions the relevance of this re-typed version of the Agreement since it was not the copy signed by the parties on April 15, 1967 and indeed was never executed thereafter.

■ I find that there is no reason, either in fact or in law, to credit defendants' version of the vacation provisions over the express terms of the executed Agreement. The unexecuted version simply does not reflect the Agreement between the parties and, at best, evinces a change of heart by Linear after entering into the Agreement of April 15, 1967. It may be, however, that in light of the nine-month work stoppage and the subsequent termination of operations, Linear struck a poor bargain in April, 1967 concerning the eligibility for 1967 vacation pay. Nevertheless, it is bound by the literal terms of its agreement. If the terms of the Agreement concerning eligibility were the least bit equivocal, a different result might obtain. Here, however, the parties did not arrive at the Agreement in a vacuum. Rather, both sides were aware of the work stoppage and indeed, the Linear management was at least aware of the tenuous future of Linear's operations and the possibility of a shutdown in the near future. *See* Tr. at 2069–74; 364–66. Under these circumstances, Linear cannot now claim that the provision concerning eligibility was something different than the one expressed within the four corners of the Bargaining Agreement.

Accordingly, I find that Linear is liable for 1967 vacation pay to both those employees who were re-called in 1967 as well as those who otherwise met the 6 month and 30 day qualifications set forth in the Bargaining Agreement.

Turning finally to the question of damages, the Union based its computation of

vacation pay for those never re-called in 1967 upon a Union seniority list. Tr. Ex. 109. It appears from this list that 166 persons met the 6 month and 30 day qualifications. Based upon seniority and job classifications the amount due this group totaled $37,461.60. Absent any evidence to the contrary or a concrete attack upon this computation, it is sufficiently certain to be recoverable.

### (C) 1966 and 1967 SUB Funding

United Rubber claims that as of August 1, 1966 Linear owed $11,500 to the SUB Fund and an additional $900.72 based upon the total number of hours worked by those members re-called in April, 1967.

As to those SUB payments due on August 1, 1966, Linear attempts to set up the statute of limitations as a bar to plaintiff's recovery. Concerning the balance of the damages, Linear simply attacks plaintiff's computations of the amount due as rank speculation. Nowhere, however, does Linear contest its liability for 1966 and 1967 SUB payments.

While the statute of limitations would normally bar plaintiff's recovery for 1966 SUB Funding, Linear stated in the Bargaining Agreement that "[t]he management recognizes its legal obligations . . to make up past due supplemental unemployment benefits." Tr. Ex. 53 at ¶ 5 of signature page. I find the Bargaining Agreement signed by Linear to be a sufficient acknowledgment under Section 17-101 of the General Obligations Law to take this debt outside the statutory period. N.Y. Gen.Oblig.Law § 17-101 (McKinney 1978).

Linear argues that since its "acknowledgment" did not recite the precise amount of SUB payments owed, it is insufficient as a matter of law. I disagree. Nowhere does the statute require that the obligor recite in the writing the precise amount of the debt. Rather, all that is required is that the writing clearly acknowledge an existing debt and that it contain nothing inconsistent with an intention by the debtor to pay it. *Lew Morris Demolition v. Board of Education,* 40 N.Y.2d 516, 521, 387 N.Y.S.2d 409, 355 N.E.2d 369 (1976).

Moreover, the plaintiff recited this $11,500 figure in a grievance filed and served upon Linear prior to the execution of the Collective Bargaining Agreement. Consequently, Linear was aware of the amount relied upon by Local 204 when it signed the Bargaining Agreement in April, 1967. Since Linear never contested the accuracy of this figure prior to signing the Agreement, I find this to be an implied acknowledgment by Linear of the amount alleged.

Finally, I find no merit in Linear's attack upon plaintiff's computation of damages. Insofar as the $11,500 claim is concerned, defendant's own witness, Frank Schevets who was the head of Linear's accounting department, testified on cross examination that $11,500 was approximately the amount of SUB payments owed by Linear at the end of July, 1966. *See* Tr. at 2088-90. Concerning the 1967 payments due, there was testimony that in 1967 the SUB Fund was reduced to zero because of Linear's poor cash flow. Tr. at 2091. Working from this zero base, plaintiff computed the number of hours worked by those re-called workers and the funding which should have been paid by Linear. I see no reason to reject these calculations and accordingly, they will stand.

### (D) Hospitalization Benefits/Blue Cross— Blue Shield Premiums

Turning to the Union's claim for hospitalization benefits, the Agreement, as amended in April, 1967, provided that:

The Company will provide without cost to the employees Sickness and Accident Insurance to the extent and upon the conditions enumerated in this Article II.

Weekly benefits in the amount of $60 will be paid for the period starting with the 8th day of disability because of non-occupational sickness and with the first day of disability because of non-occupational accident and will continue to 26 weeks if the employee is unable to work because of such injury or sickness.

Under this provision, plaintiff's computations, through the testimony of George Marsden, yielded a claim of $310. Tr. at 1616; Tr. Ex. 154. While Linear does not seriously contest its liability under the Bargaining Agreement, it does argue that a claim for such benefits would lie only against an insurance carrier and is improperly lodged against Linear.

 While the Bargaining Agreement may have contemplated a private insurer, there is no language mandating such a situation.[15] Moreover, since only Local 204 and Linear were parties to the Bargaining Agreement—the obligation to provide weekly benefits to those employees who qualified ran directly from Linear to Local 204. Linear cannot now seek sanctuary behind an apparently non-existent insurance company. Thus, I find the $310 claim to be recoverable by plaintiff.

I turn now to United Rubber's claim for Blue Cross—Blue Shield premiums which it argues Linear owes the members of Local 204. The Bargaining Agreement provides in pertinent part:

The Company will provide without cost to employees, Hospitalization, In-Hospital Medical and Surgical Insurance Benefits. Tr. Ex. 53 Insurance Agreement Article III.

It also provides that:

In the event of lay-off, coverage under the Plan will be continued to the end of the calendar month following the month during which the lay-off occurs. Tr. Ex. 53 Insurance Agreement Article IV.

The Union claims that of the 254 employees who went on strike in August, 1966, only 98 were re-called. They urge that the remaining 156 were technically laid-off as of April, 1967. They conclude, therefore, that these 156 employees were entitled to premium payments for May, 1967 totaling $2,652.

Linear, however, argues that the "lay-off" occurred on July 31, 1966 and accordingly the employees were entitled only to recover premiums through August, 1966. Since these premiums were paid by Linear, it urges dismissal of this claim.

 Nowhere in the Bargaining Agreement is the term lay-off defined. I find, however, that from the manner in which this term is used throughout the Agreement, it was not intended to encompass a strike or a work stoppage. *See, e. g.,* Tr. Ex. 53 §§ 7.0, 7.3, 7.4, 7.10 and 7.11. Rather, it was intended only to refer to a temporary unemployment resulting from a slow-down in the operation of the plant or some such similar occurrence. Suffice it to say that a lay-off is a temporary unemployment which results from a decision solely by management whereas the temporary unemployment which results from a strike is the consequence of a decision reached by the employees.[16] Thus, there can be no doubt that the work stoppage commencing July 31, 1966 was not the equivalent of a mass lay-off. The question, therefore, is whether those employees who struck in July, 1966 remained Linear employees, for purposes of the Bargaining Agreement, until April, 1967 when the labor dispute was resolved,

---

15. The Bargaining Agreement provides:

The Company *may* enter into a contract or contracts with an insurance company or companies to provide the benefits described herein, *and upon so doing the Company shall be relieved of any individual liability to any employee other than to maintain such contract or contracts in force; provided, however, that no such contracts shall alter, amend, or detract from the provisions of this Agreement.*

See Tr. Ex. 57 at Article VI of the Insurance Agreement. (emphasis supplied).

While it was clearly permissible for Linear to provide for insurance coverage by resorting to an insurance contract with a third party insurer, there was no evidence that Linear entered into such a contract. Accordingly, Linear's primary liability under the Bargaining Agreement survives.

16. Section 501 of the Labor Management Relations Act, 29 U.S.C. § 142, provides that a strike includes "any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees."

and if so, whether those not re-called at that time were thereafter "laid-off." Under all the circumstances, these questions must be answered in the affirmative.

Turning first to the status of the striking Union members, I find that all attendant circumstances indicate that the Linear management considered these individuals to be its employees through April, 1967. For example, all Union members employed by Linear when the work stoppage commenced were later reimbursed for all Blue Cross payments which accrued during the stoppage. Tr. at 1606–08, 2091. If indeed Linear considered these individuals as either terminated or laid-off employees, then why did it reimburse them for payments through April, 1967 when under the Bargaining Agreement its obligation would have terminated at the very latest in September, 1966? Given Linear's financial posture, I find it improbable that Linear was simply being generous with these individuals. It is far more likely that the reason for the reimbursements was that Linear still considered these individuals as its employees.

This conclusion is further supported by the Bargaining Agreement which provides that:

> It is agreed there will be no loss of seniority for any employees due to the prolonged work stoppage. Tr.Ex. 53 at ¶ 4 of the signature page.

According to the testimony of defendants' own witness, Frank Schevets, Linear's controller during the period at bar, an individual who is on the company seniority list is considered an employee. Tr. at 2076. Thus, it would appear that by insuring seniority during the work stoppage for its work force, Linear itself considered these individuals as its employees.

Moreover, Section 2(3) of the Labor Management Relations Act, 29 U.S.C. § 152(3), provides that "[t]he term employee . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute." *See also* NLRB v. Hartmann Luggage Co., 453 F.2d 178, 181 (6th Cir. 1971). In addition, at least one Court has recognized that "[the]

absence from work because of an economic strike does not constitute a termination of the employer-employee relationship *and does not vitiate the continuous service of an employee."* Local 7–644 Oil, Chemical & Atomic Workers International Union v. Mobil Oil Co., 350 F.2d 708, 711 (7th Cir. 1965), cert. denied, 382 U.S. 986, 86 S.Ct. 563, 15 L.Ed.2d 474 (1966). (emphasis added)

Thus, I find that under the particular circumstances presented herein, Linear's striking workers remained Linear employees through April, 1967 when operations were recommenced. In addition, I find that those employees neither re-called nor terminated after the commencement of operations were at that time laid-off. And consequently, under the terms of the Bargaining Agreement, these individuals were entitled to hospitalization premiums for May, 1967. Furthermore, I find plaintiff's computations, based upon the testimony of George Marsden, Tr. at 1745, to be sufficiently accurate to support an award of damage in this regard.

## (E) Pension Claims

The Pension Agreement between Linear and Local 204, originally scheduled to expire in July, 1967, was extended in the Bargaining Agreement until April 15, 1971. The Agreement provides:

> The Company hereby establishes a Pension and Severance Award Plan for its employees in the bargaining unit for which the Union is the authorized bargaining agent.
>
> In addition, the Company agrees to provide in a trust or trusts and or by means of an Insurance Company contract or contracts, assets of any amount estimated on a sound actuarial basis, to be sufficient to pay all pensions and severance payments and disability payments awarded under the plan. The Company will, however, as a minimum, contribute to the fund each year during the continuance of this agreement.
>
> (1) An amount equal to the normal cost of the plan for each year, plus

(2) An amount which, paid annually for 30 years would fund the accrued liability under the plan.

It further provides:

Section 1—Normal Retirement

(a) Any employee who on or after the effective date of this Plan attains the age of 65, completed ten (10) or more years of credited service as provided in Article IV and ceases active service, will be entitled to receive a pension.

Section 2—Early Retirement

On and after the effective date of the Plan any employee who has attained age 55 but not age 65 and who has fifteen (15) or more years of credited service may retire and, unless he elects a Deferred Vested Pension, he will be entitled to a pension commencing at the time of early retirement.

Section 4—Deferred Vested Pension or Severance Award

An employee, whose service with the Company is terminated after the effective date of the Plan for any reason except death and after he has completed seven (7) years of continuous service, shall be entitled to either:

(a) A Deferred Vested Pension starting when he attains age sixty-five (65) and computed in accordance with Article II, Section 1(b) but based on continuous service to date of termination; or

(b) A Serverance [sic] Award, (if not eligible for a pension at date of termination under the provisions of Sections 1, 2 or 3 hereof)

(6) An employee, eligible for deferred vested pension or severance award under this Section 4 of Article II, must within thirty (30) days of his termination date, file with the Company his written election to receive either the deferred vested pension or the severance award. Such election once made may not be revoked. Failure to file such election within the thirty (30) day period shall constitute an election of the deferred vested pension.

Section 5—Employees not Actively at Work

The absence of an employee from active work at the time he would be eligible to retire under the Plan will not preclude his retirement without return to active work, provided that such absence is due to layoff, sick leave or other Company approved leave of absence.

Pursuant to the Pension Agreement, Linear set up a pension and/or severance fund with the Lincoln National Life Insurance Company [hereinafter referred to as "Lincoln"].

As of December 1, 1967 the funds on deposit with Lincoln totaled $24,692.24. Thereafter, at least 65 former Linear employees accepted lump sum payments aggregating $7,858.11 from Lincoln which were to represent their share of the pension/severance funds on deposit. Thus, a balance of $16,834.13 (excluding interest) still remains on deposit at Lincoln.

The pension benefits set forth in the Bargaining Agreement were in effect when Great American acquired Linear in 1961. However, the testimony revealed that Linear's former owners were financially unable to finance the pension program and, as a result, when Great American acquired Linear, there was an outstanding obligation to fund the program based upon the past service of Linear employees, [hereinafter referred to as "accrued past service liability"]. Rather than funding the total accrued past service liability in one lump sum upon the acquisition, Great American and Local 204 agreed, as provided above, that Great American would fund this past liability each year over a 30 year period at the end of which Great American would have totally eliminated this accrued past service liability.

The precise claims of United Rubber under the instant Pension Agreement are many and varied. They include: (a) those sums which were or should have been on

deposit at Lincoln on July 30, 1967 to reflect the normal cost of the pension plan as well as that amount required to reduce the accrued past service liability under the 30 year plan for the years 1961 through April 1971; (b) alternatively the Union seeks these amounts for the years 1961 through July, 1967, when the Linear plant closed; and (c) pension payments for those individual Union members whose pension rights vested under one of several vesting provisions in the Bargaining Agreement.

Linear has never contested United Rubber's entitlement to those funds which were or should have been on deposit with Lincoln on July 14, 1967 and accordingly, I find plaintiff entitled to those funds. (Defendants' Post Trial Brief at p. 45A). Linear, however, bitterly contests any and all liability for funding after the permanent closing of its plant in July, 1967. It also argues that no pension rights had vested under the Bargaining Agreement. In short, Linear argues that any obligation it had to fund the pension plan terminated when it ceased its manufacturing operations and all rights thereunder became fixed as of that date.

■ It is now beyond dispute that an employer has the right to close his business and, in doing so, terminate the employer-employee relationship. *Textile Workers v. Darlington Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).[17] *See also Union de Trabajadores v. Helio San Jeronimo Corp.*, 434 F.Supp. 643, 646 (D.P.R.1977). This is equally true where the termination occurs during the life of a collective bargaining agreement since the rights of employees under a bargaining agreement presuppose an on-going employer-employee relationship. *Fraser v. Magic Chef-Food Giant Markets, Inc.*, 324 F.2d 853 (6th Cir. 1963). Indeed, in *Fraser* the Court held that

> . . . A collective bargaining agreement, in ordinary usage and terminology, does not create an employer-employee relationship nor does it guarantee the continuance of one. Employee's

rights under such a contract do not survive a discontinuance of business and a termination of operations. *Id.* at 856. Thus, the function of a collective bargaining agreement is solely to govern the terms and conditions under which the employment relationship will be conducted and only so long as such a relationship continues.

■ It is only where the bargaining agreement either restricts an employer's otherwise unfettered right to terminate his business operations, expressly provides that certain rights will survive the termination of the employer-employee relationship, *Fraser, supra*, at 857, or where certain fringe benefits established under a labor agreement have vested prior to the termination of the relationship, *Flintkote Co. v. Textile Workers Union of America*, 243 F.Supp. 205, 209 (D.N.J.1965), that an employee is entitled to benefits conferred under a bargaining agreement after severance of the employer-employee relationship.

■ Reviewing the Bargaining Agreement in issue, I find nothing which purports to limit Linear's inherent ability to terminate its manufacturing operations. Nor do I find any indication that the parties intended the pension program to survive the severance of the employer-employee relationship insofar as *future funding* of the pension program is concerned.

Plaintiff, however, urges that those sums which Linear agreed to pay, over a 30 year period, to reduce accrued past service liability requires a different analysis. The Union argues that unlike future funding for future employment, this aspect of the pension agreement does not contemplate an on-going employer-employee relationship. To the contrary, it is founded upon a *prior* relationship and contemplates recovery for these past services. Thus, the Union concludes that that portion of the pension agreement by its nature survives the termination of the employer-employee relationship. I disagree.

---

17. Indeed, in *Textile* the Court held that even where the closing is motivated more by spite against the Union than by business reasons, an employer is still free to terminate his business operations. 380 U.S. at 272, 85 S.Ct. 994.

■ It is evident that although the provision for the funding of past service liability is founded upon services already rendered, by its very terms the agreement contemplates an on-going employment relationship. Indeed, it provides for funding over a 30 year period. I find this funding to be no different than any other future funding of a pension plan. Thus, Linear's obligation to continue funding terminated in July, 1967 when it terminated its operations.

■ Moreover, there is no merit in plaintiff's argument that payment for the 30 year funding had vested prior to Linear's termination of operations in July, 1967. It is clear that the provisions of the pension agreement, including the 30 year funding, were merely a part of the Bargaining Agreement and as such subject to the time limitations contained therein. As each Bargaining Agreement expired the 30 year funding provision was subject to revision and even exclusion in each new Bargaining Agreement and, consequently, it cannot be said to have vested prior to July, 1967. Only those payments due on or before the termination of operations at Linear had vested and any recovery is necessarily limited thereto.

I turn finally to those pension claims which United Rubber urges had vested when Linear terminated its operations in 1967. The Bargaining Agreement is quite explicit concerning when an employee's pension rights vest. See Sections 1, 2 and 3 of the Pension Agreement quoted above. There are essentially three separate vesting provisions:

(1) Employees who have completed 10 years of service at Linear, attain the age of 65 and cease active service (§ 1);

(2) Employees who have completed 15 years of service at Linear, attain the age of 55 and cease active service (§ 2); and

(3) Employees whose services with Linear were terminated after 7 years of continuous service (§ 4). These vesting provisions are all tempered by § 5 of the pension agreement which provides that the "ab-

sence of an employee from active work at the time he would be eligible to retire under the Plan will not preclude his retirement . . . provided that such absence is due to layoff, sick leave or other Company approved leave of absence."

Linear argues that the clear intent of the pension program was to impose three conditions precedent to the vesting of any pension rights. First, an employee must work at least 7, 10 or 15 years at Linear. Second, the employee must attain the age of 65 under the 7 and 10 year plans or 55 years of age under the 15 year plan. Third, the employee must be actively working when the year and age requirements are met—absent one of the three exceptions delineated in Section 5 above—for pension rights to attach. Linear concludes, therefore, that only those employees who met all three conditions when Linear terminated operations are entitled to any pension benefits.

■ Clearly those individuals who were re-called by Linear before July 1967 and who met both the age (55 or 65) and duration of service (15, 10 or 7 years) requirements as of July are entitled to pension payments.

Those individuals who do not fall into the above categories present a somewhat more complex situation. The question is whether these individuals with either 7, 10 or 15 years of service had to be actively employed at Linear when they reached 55 or 65 years of age for their pension rights to become absolute.

Plaintiff argues that under all three vesting provisions those individuals with the requisite duration of service who reached either 55 or 65 years of age after July, 1967 are entitled to a pension. It urges that under the terms of Section 5 these individuals were permanently "laid-off" and thus, were not required to be actively working when they attained retirement age. I find no merit in this argument. The exceptions enumerated in Section 5 are quite explicit and are clearly inapplicable to the case at bar. Here we are dealing not with a lay-off situation, but rather with a final termination of operations. As I indicated above, a

lay-off as contemplated in the instant Bargaining Agreement is a "temporary unemployment" initiated by the employer whereas a termination is a permanent severance of an employee. There can be no doubt that in July 1967, Linear permanently terminated operations at its Dallas, Pennsylvania plant. *See* Tr. Ex. 82.

■ Turning to the vesting provisions themselves, I find that both the 10 and the 15 year plans contemplate an employee who attains the requisite age and duration of service requirements while actively working at Linear (save a Section 5 exception).[18] Consequently, both provisions have imposed three separate conditions which must precede the vesting of any pension rights.

■ The 7 year provision, however, presents a different situation. Here the plain terms of the Bargaining Agreement contemplate an employee departing from Linear *before* he attains retirement age. Accordingly, I find that all those employees who had completed 7 years of continuous service by July, 1967 and who have subsequently reached the age of 65 are entitled to a deferred vested pension as provided in Section 4(a) of the Agreement. I also find that whatever option a Linear employee with 7 years of service may have had in July, 1967 to elect either a deferred vested pension (Section 4(a)) or a Severance Award (Section 4(b)) has long since been waived. Under Section 4 an eligible employee must elect either a pension or severance award within 30 days of his termination, the failure of which shall constitute an election of a deferred vested pension. Section 4(6). Those individuals who failed to elect are entitled only to a deferred pension. The Union and its members knew or can be charged with knowledge of Linear's termination of operations at least as of September, 1967. Thus, there is no reason to toll the period within which its members could elect under Section 4.

Linear's final objection to the vesting of pensions concerns certain "releases" executed by various members of Local 204 in return for a lump sum settlement from the Lincoln pension fund upon Linear's demise. Each release, entitled "Request to The Lincoln National Life Insurance Company For a Lump Sum Settlement," was in the name of an individual employee. There were two forms of releases employed by Lincoln which respectively provide:

(a) I hereby waive all annuity payments which may be payable to me under Group Annuity Contract GA–188 because of the termination of Group Annuity Contract No. GA–188. By acceptance of this lump sum payment, I hereby agree that the Lincoln National Life Insurance Company's obligation to me with respect to GA–188 is satisfied, and I hereby release the Lincoln National Life Insurance Company from liability in any and all claims which I may have filed or may file in the future which might involve this contract GA–188.

(b) I hereby accept a lump sum payment of $_____ due me with respect to Group Annuity Contract GA–188 because of the termination of Group Annuity Contract No. GA–188. By acceptance of this lump sum payment, I hereby agree that the Lincoln National Life Insurance Company's obligation to me with respect to GA–188 is satisfied, and I hereby release the Lincoln National Life Insurance Company from liability in any and all claims which I may have filed or may file in the future which might involve this contract GA–188.

Each release was signed by the individual employee and witnessed by a Lincoln official. It appears that at least 65 Linear employees accepted lump sum settlements

---

**18.** This is equally true under the disability pension provisions under the Bargaining Agreement:

An employee with at least fifteen (15) years' accredited service and who, subsequent to the effective date of the Plan, becomes totally and permanently disabled, as defined in (b) below, will be entitled to a disability pension as hereinafter provided. This provision clearly contemplates an employee who had 15 years of accredited service and in addition was actively working at Linear at the time of the disability.

in exchange for execution of the release—the bulk of whom executed the latter form of release.

Linear contends that these releases act as an absolute bar to any other pension rights an employee may have had. Plaintiff, on the other hand, argues that these releases are only between Lincoln and the individual employees and were intended only to bar an action by an employee against Lincoln for the disbursement of the funds on deposit.

■ It is clear that the scope and meaning of a release must be determined by reference to the intention manifested by the parties. *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (2d Cir. 1965). It appears that under all the circumstances surrounding the releases at bar, they were intended only to bar future actions by an employee against Lincoln and were not intended to have any effect whatsoever upon Linear's liability under the Bargaining Agreement. Indeed, both forms of release refer not to the Bargaining Agreement but only to the "Group Annuity Contract" and any liability arising thereunder. I find that this unequivocally evinces an intention by the employees to release their claims only insofar as the fund itself was concerned. There is no indication that the parties intended to bar any claims which might arise under the Bargaining Agreement concerning their pension rights. Indeed, this conclusion is compelled by the fact that the releases were executed only by a Lincoln official and the individual Linear employees. No Linear officials were parties to the releases nor is there any indication that the Lincoln officials were acting on behalf of Linear in witnessing the releases. Thus, while these lump sum settlements will act to reduce an individual's recovery of a pension award, they do not act as a bar to those 65 employees who executed them.

*Computation of Pension Awards*

Plaintiff claims that when Linear terminated its manufacturing operations the minimum required deposit should have been $239,964.12. However, the total deposits at that time amounted to only $190,537.10.

Since Linear neither contests its liability for the difference between these sums, nor takes exception with plaintiff's computation thereof, I find that Linear is liable for the difference between those funds on deposit and those which should have been on deposit with Lincoln which amounts to $49,427.02.

I have reserved until last the computation of those pension awards which I found to have vested at the time Linear closed its operations. It is unclear from the record before me the precise number of former Linear employees who have reached the age of 65 and are thereby entitled to pension payments. I believe much of the confusion may be remedied by consultation with those individual Union members, or their families, who are entitled to pension payments. Indeed, John Horn testified that United Rubber has in its possession a list of all its members—past and present—from which it can locate these individuals. Tr. at 1886–87. Accordingly, I direct plaintiff to submit a list of those employees who, on July 12, 1967, were credited with seven years of continuous service at Linear and have reached the age of 65. If some of these individuals have passed away after reaching 65, the period for which these individuals were entitled to pension benefits should also be noted. From this list, plaintiff is directed to compute the payments due these individuals. Finally, for those who have not yet reached 65 years of age a reserve fund shall be calculated based upon actuarial tables. Excess funds from this reserve shall be returned to the defendants upon the death of the last individual entitled to a pension payment.

I turn finally to the question of Severance Awards under Article II, Section 4(b) of the Pension Plan. As previously noted, I found that any entitlement to a severance award under these provisions has long since been waived. *Id.* at Section 5. Accordingly, no severance awards are recoverable by plaintiff and that portion of its complaint is dismissed.

■ To summarize, I find Linear liable for its obligations under the Bargaining Agreement as follows:

(a) 1966 vacation pay totalling $52,000;

(b) 1967 vacation pay totalling $66,-803.20;

(c) 1966 and 1967 SUB Funding totalling $12,400.72;

(d) Hospitalization Benefits totalling $310.00 and Blue Cross—Blue Shield Premiums totalling $2,652.00;

(e) Pension Funds which should have been deposited at Lincoln totalling $49,427.02; and

(f) Pension Claims which shall be computed by United Rubber as directed above.

## V. *Great American, Rubatex and Rubatex Holding*

Having established the fact and extent of Linear's liability to United Rubber under the Bargaining Agreement, I now must consider whether its liability may be assessed against any of the separate, yet related, corporate entities within the Great American complex.

It is clear that all of Linear's assets have long since been distributed by Rubatex Holding and Linear left as a mere corporate shell.[19] No one disputes, however, the fact that the members of Local 204 were totally excluded from this distribution. It is equally apparent that unless the assets of Great American, Rubatex and Rubatex Holding are available to meet Linear's obligations under the Bargaining Agreement, these obligations will go unsatisfied. Consequently, plaintiff attempts to reach the assets of the Great American complex under one of three theories. The first is that Linear was so dominated and controlled by Great American, Rubatex and Rubatex Holding in its operation and liquidation that Linear's corporate veil should be pierced in order to reach the assets of these other corporate defendants. Second, plaintiff urges that the mortgage, note and security agreement executed by Linear in September, 1967, to secure its "antecedent" debt to Great American and Rubatex, were fraudulently procured and therefore should be set aside

and the value of these secured assets applied to Linear's labor obligations. Third, plaintiff argues that the transfer of Linear's assets from Rubatex to Rubatex Holding and their subsequent distribution by Rubatex Holding constituted a bulk sale in violation of Pennsylvania's Bulk Sales Law. 69 Pa.Cons.Stat. §§ 521–528.

The defendants, of course, argue that their financial dealings with Linear were at all times above reproach. They contend that over the years they collectively advanced to or invested in Linear to the tune of 2.5 million dollars before the 1967 shutdown. They further argue that despite their secured status as of September, 1966, they were only partially compensated for these sizable advances upon the liquidation of Linear's assets. They conclude, therefore, that to require them to satisfy Linear's obligations under the Bargaining Agreement would in essence require them to twice pay for their unsuccessful Linear venture.

### A. *Piercing the Corporate Veil*

The scenario of financial dealings between Great American, Rubatex, Rubatex Holding and Linear is as follows. After acquiring Linear, Great American established itself as Linear's primary lender. In doing so, it segregated its investment in Linear into one account [hereinafter referred to as the "investment account"], and all its advances to and purchases on behalf of Linear into a separate account [hereinafter referred to as the "advances account"]. While Great American apparently deemed its advances to Linear as loans, a formal debtor-creditor relationship was never established. P.T.O. ¶ 13. For example, Great American never established a repayment schedule nor did the parties agree upon a specific rate of interest on the balance due. (Answers to Plaintiff's Interrogatories 5(c) and 5(g)). In addition, Great American never attempted to secure its advances in any way. Moreover, these "loans" were never embodied in a written instrument such as a note or formal loan

---

**19.** Apparently Linear, although quite insolvent, has never been formally dissolved. P.T.O. ¶ 27.

agreement. Rather, they were simply carried upon the books and records of Great American and Rubatex. Tr. at 612. Great American did periodically charge Linear interest on its advances, albeit at a rate which it unilaterally established, which became part of the total debt reflected in the advances account. Tr. at 1102, 2130. *See also* Answers to Plaintiff's Interrogatories 5(c) and 5(g).

In December of 1962, just prior to the transfer to Rubatex, Great American's investment account reflected a total of $199,000 and its advances account reflected a total of $700,000. Tr. at 937; Tr. Ex. 26, 115. United Rubber, however, charges that the figures in these accounts were grossly and unnecessarily inflated by Great American as the result of certain questionable financial maneuvers calculated to insure Linear's indebtedness to Great American. The Union further charges that these transactions bear witness to the absolute control Great American possessed over Linear's financial structure and the cavalier manner in which Great American manipulated Linear's already precarious financial position.

In particular, the Union focuses upon the sale by Great American to Linear in 1962 of a 14,350 share block of Hazel Bishop common stock. Apparently Great American purchased the stock at $22 per share which amounted to a total investment of $315,700. Thereafter, when the stock began to decline, Great American transferred all its shares to Linear at the then market price of $12 per share or $172,000. As a result of the transfer, Great American was able to unload its entire block of Hazel Bishop stock at the market price while sustaining a $143,500 loss on its investment. In addition, Linear was further indebted to Great American for the $172,000 purchase of the declining stock plus interest as it accrued.

The defendants urge that the entire Hazel Bishop affair was nothing more than an unsuccessful attempt to boost the assets of Linear, Tr. at 720, and at worst could be characterized as an exercise of poor business judgment. The circumstances surrounding the sale of the stock, however, belie such characterizations. Instead, they evince an attempt by Great American to obtain the maximum price for this substantial block of stock while minimizing its own losses and further increasing Linear's indebtedness. For example, Great American obtained the block of Hazel Bishop stock sometime prior to 1961, Tr. at 953, at $22 per share. However, it was not until late 1962 that the stock was transferred to Linear and only after it had dropped to $12 per share. Moreover, after the transfer to Linear and while on its books the stock was entirely disposed of in a series of 18 separate transactions between December 1962 and August 1963, see Tr. at 952–57, with the bulk of the shares trading at $5 per share.

The facts as they developed at trial indicate that had Great American gone into the market place and attempted to peddle a 14,350 block of the already declining Hazel Bishop shares, in all probability the price realized would have been considerably below the then market price, if indeed the block could have been disposed of in such a manner. The obvious alternative was to sell the Hazel Bishop shares in smaller lots. In doing so, however, Great American would have been forced to absorb the almost certain future declines in the value of the shares. Instead, what Great American did was to transfer the entire block to Linear at the market value, thereby freezing its own loss on the entire block. Thereafter, Linear, as the dutiful subsidiary, disposed of the entire block in small lots over the course of one year. In doing so, however, Linear sustained a $100,000 loss in the bargain. Thus, in the final analysis the already cash starved and financially tottering Linear was further indebted to Great American for $172,000 plus interest in addition to sustaining a $100,000 loss upon the ultimate sale of this "asset."

These questionable financial transactions were by no means peculiar to Great American's ownership of Linear. Indeed, they continued even after Linear was transferred to Rubatex in late 1962. For example, in 1964 at the direction of Rubatex, Linear

adopted a new rubber manufacturing process. Tr. at 703–06, 767. This new process, called the extruder process, was intended to bring Linear in line with the type of products manufactured by Rubatex. In order to implement the new process it was necessary for Linear to secure a commercial loan for $600,000 to cover the expense of new equipment and plant modifications. The loan was secured by the bulk of Linear's assets. Tr. Ex. 15. In addition to the loan, however, additional funds were required to complete the transformation to the extruder process which were advanced by Rubatex, thereby increasing Linear's indebtedness to it.

Despite the substantial expense incurred by Linear, the new process was only employed for six months whereupon Great American and Rubatex decided to scrap the "experiment." Tr. at 748–49. Thereafter, all the barely used extruder equipment was dismantled and transferred to Rubatex, all at Linear's expense. For purposes of the transfer the equipment was valued at book value to which certain discounts, all of which were favorable to Rubatex, were applied. Tr. at 1959; Tr. Ex. 28 nn.4, 6; Tr. Ex. 29 n.5.

Again defendants argue that at best the extruder incident evinces poor business judgment on the part of Great American and Rubatex and is a far cry from the type of overreaching or fraud alleged by plaintiff. While it is difficult to ascertain a party's motives upon a cold trial transcript, I find that the incident, considered in light of all the circumstances, tends to prove more than poor business judgment. It demonstrates the attitude Great American possessed with respect to the assets of Linear and its financial position. Although Great American and Rubatex's motives may have been well intentioned at the inception of the extruder incident, as the deal soured Great American and Rubatex once again attempted to cut their own losses, burden Linear with the bulk of the loss and strip Linear of any asset which it may have otherwise been left with at the conclusion of the unsuccessful business venture. All this resulted in Linear's becoming further indebted to Rubatex and in turn to Great American. See generally Tr. at 747–69.

After the extruder incident, Linear's debt to Rubatex was increased to $1,214,000. This was the amount of debt reflected on Linear's books when the work stoppage began at the Linear plant. When it became apparent that the labor dispute at Linear was not destined for immediate or even speedy resolution, Rubatex decided to secure its prior advances to Linear. Accordingly, in September, 1966, Linear executed a promissory note, financing statement and mortgage in favor of Rubatex ["the financing agreements"], by which Linear pledged the bulk of its assets to secure Rubatex's prior advances. These agreements, which elevated Rubatex for the first time to secured creditor status, were executed for Linear by James Groendyk and Bernard Martin, the president and secretary of Linear, Inc. These individuals were also officers of Great American, Rubatex and a host of other rubber manufacturers in the Great American complex when the agreements were executed.

As it developed Linear terminated its manufacturing operations in July, 1967, just 10 months after pledging the bulk of its assets to Rubatex. Thereafter, in August, 1967, Rubatex formed a wholly-owned subsidiary, Rubatex Holding, to take title to and liquidate all of Linear's assets. By the end of August, Rubatex Holding acquired the title to the Linear plant and a bill of sale for the majority of Linear's tangible assets. Tr. Ex. 22, 137. Those remaining assets not covered by the financing agreements were the subject of a subsequent bill of sale to Rubatex Holding—executed by Linear's President James Groendyk and witnessed by Great American's Board Chairman Walter Mack. Tr. Ex. 21.

Having effectively funnelled all of Linear's assets to Rubatex Holding, their distribution and liquidation was orchestrated by Great American and Rubatex. First, the Hercules Packing Corporation was given the opportunity to sift through all of Linear's tangible assets and without benefit of

competitive bidding to pick those it wished to purchase. As one might expect, Hercules chose to purchase the most valuable and desirable pieces of equipment. Tr. at 528, 832, 1542–50; Tr. Ex. 23. These assets were thereafter conveyed to Hercules in a transaction which was described at trial as "a darned good deal." Tr. at 834.

Next, James Groendyk, as the head of Great American's rubber division and the President of both Linear and Rubatex, determined how Linear's remaining equipment would be divided among the various Great American subsidiaries. Tr. at 551–56; Tr. Ex. 40. To this end, he directed that each piece of equipment be physically tagged for shipment to the appropriate Great American subsidiary. John T. Evans, controller of both Rubatex and Rubatex Holding, was then given the task of "accounting" for the transfer of assets to Rubatex Holding. Tr. at 1306–09. In short, Mr. Evans was to value the assets for purposes of the transfer. However, at no point prior to the transfer to Rubatex Holding did Evans ever physically inventory the assets of Linear. Tr. at 1574–79. Rather, he placed values upon the assets from Bedford Virginia, where Rubatex's offices were located, without benefit of visual inspection based only upon "fixed asset cards." These cards contained the original cost of the asset minus the depreciation taken over the years.

As originally "inventoried" by Evans, Linear's assets were valued at $2,052,347 less secured obligations to third parties (those outside the Great American complex) of $847,763. This left Linear's total net assets at $1,204,584. Under the valuation method employed by Evans, however, many of the assets held by Linear had no book value in 1967. Accordingly, these assets were not considered in arriving at Linear's net assets. Tr. Ex. 141, 142.

The entire process employed by Evans was attacked by plaintiff's expert witness, Peter Skomorowsky, a Certified Public Accountant. Mr. Skomorowsky testified that in his opinion good accounting principles demand that a parent obtain the fair market value of the assets in issue rather than simply employ their book value. Tr. at 1465–67. In any event, it was clear from Mr. Skomorowsky's testimony that book value is merely an "historical accident" having little if any relevance to the asset as it presently exists. Tr. at 1465. Considering his qualifications and his testimony as a whole, I accept his views.

It was not until March, 1968, seven months after the transfer to Rubatex Holding, that an "independent appraiser", the United Rubber Exchange Corporation of Newark, New Jersey, was employed to establish a fair market value of Linear's assets. Tr. Ex. 40. The value of these assets was set by the appraiser at $286,530.75. Thereafter, Groendyk and Doug Garrett, the treasurer of Rubatex, unilaterally "revised" the appraisal. Tr. Ex. 95. The practical effect of this revision was to mark down the appraised value from $286,530.75 to $146,785.84, Tr. Ex. 40, thus further deflating the fair market value of Linear's assets.

Turning first to the "appraisal" itself, defendants concede, and rightly so, that it "was not a true and proper appraisal." See Defendant's Post Trial Memorandum at 71. See also Tr. at 1501–08, 1467–70. It is clear that the appraisal took place long after the transfer of assets to Hercules and the various Great American subsidiaries. See dates of transfers, Tr. Ex. 41–46. Consequently, the appraisal was given without benefit of a physical inspection of the equipment in issue. Rather, it was based solely upon the list of equipment submitted by Rubatex which contained only a brief description of each item. Tr. Ex. 40. In addition, plaintiff's expert, Peter Skomorowsky, in reviewing the "appraisal" found it to be woefully inadequate in many respects. See Tr. at 1467–70. Not satisfied with this admittedly inadequate appraisal, however, Groendyk and Garrett tampered with the figures to further reduce the value of Linear's assets.

In sum, it is evident that all attempts to value Linear's assets upon the termination of operations were tainted by the efforts of

Great American and Rubatex officials to keep these values deflated. It is equally clear that the opportunity to obtain a genuine fair market valuation of Linear's assets has long since been lost and under the circumstances responsibility for this must be placed squarely upon the shoulders of Great American, Rubatex and Rubatex Holding. Indeed, they were the only entities in a position to secure such a valuation. Their failure to do so together with their attempt to feign such a valuation must accordingly be construed most harshly against them.

 It is clear that Courts must move cautiously when presented with questions involving the corporate independence of a parent and its wholly-owned subsidiary. *Country Maid, Inc. v. Haseotes,* 299 F.Supp. 633, 637 (E.D.Pa.1969). Indeed, the general rule is that "separate corporations will not be regarded as a single entity so as to hold one responsible for the acts and obligations of the other," *Technograph Printed Circuits Ltd. v. Epsco, Inc.,* 224 F.Supp. 260, 263 (E.D.Pa.1963), even where the parent has the ability to control its wholly-owned subsidiary. *Whayne v. Transportation Management Service, Inc.,* 252 F.Supp. 573, 577 (E.D.Pa.1966), *aff'd* 397 F.2d 287 (3d Cir.), *cert. denied,* 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 438 (1968). Rather, it is only where the parent chooses to exploit its dominant position over its subsidiary and become so involved and intertwined in its activities that a Court will disregard corporate formalities and hold the parent liable for the obligations of its subsidiary. In particular, it has been held that the party seeking to disregard the corporate independence must prove by a preponderance of the evidence:

(1) that the parent controls and dominates the subsidiary to such a degree that the subsidiary is a mere instrumentality of its parent;

(2) that through its domination and control of the subsidiary the parent is perpetrating a fraud or working an injustice (e. g., torts, violation of a statute or stripping the subsidiary of its assets); and

(3) these elements result in an unjust loss or injury to the party disavowing corporate independence, such as the insolvency of the subsidiary.

*Whayne v. Transportation Management Services, Inc., supra* at 577.

 Applying these elements to the case at bar, the inescapable conclusion is that Linear's corporate veil must be pierced and the assets of Great American, Rubatex and Rubatex Holding applied to satisfy Linear's obligations under the Bargaining Agreement.

Turning to the first element I find that although none of the following facts individually are dispositive, collectively they demonstrate the domination and control of Great American, Rubatex and Rubatex Holding over Linear so as to render Linear a mere instrumentality of its corporate parents and grandparent.

(1) In 1961 Great American acquired all the common stock and much of the outstanding preferred stock of Linear.

(2) In December, 1962 all this stock was transferred to Great American's wholly-owned subsidiary Rubatex in a tax free exchange.

(3) The grandparent, Great American, and all its subsidiaries, including Rubatex, Rubatex Holding and Linear, shared an almost identical Board of Directors. The common directors included James Groendyk, George Marren, Walter Mack and Irving Stolz.

(4) While at times proper corporate formalities were observed, there was evidence that at other times these formalities were disregarded. For example, joint director's meetings for Great American and its subsidiaries would often be held in Great American's New York offices since three of the overlapping directors—Mack, Groendyk and Marren—were stationed in New York. Tr. 600–01. Apparently, Mack, Groendyk and Marren would arbitrarily decide whether a given meeting was to be classified as an individual directors' meeting for Great American, Linear or one of the other Great American corporate entities or as a joint

meeting for some combination thereof. At any rate, it is evident that Mack, Groendyk and Marren were the three key individuals in the Great American complex who, from New York, directed the many Great American subsidiaries. Tr. at 598–99. Indeed, Mack, Marren and Groendyk constituted three of the five man Executive Committee of Great American. Tr. Exs. 1–8. Another of the overlapping directors, Irving Stolz, was the fourth member of Great American's Executive Committee. *Id.*

(5) In addition to the overlapping directorates, Great American, Rubatex and Linear operated through identical principal executive officers. These included Groendyk, Mack, Marren and Stolz. Tr. at 823; Tr. Ex. 127. While there were local managerial personnel supervising the daily operations of Linear and the other Great American subsidiaries, these individuals possessed limited authority, Tr. at 1080–87, and were viewed as interchangeable parts to be shuttled from one subsidiary to the next as the need arose. Tr. at 454. More importantly, however, these executive officers, as well as the overlapping directors, did not act independently and in the interest of Linear. Instead, they acted solely for the benefit of Great American and Rubatex, Linear's parent and grandparent.

Perhaps the most vivid example of the complete domination of these Great American and Rubatex officials over Linear's local people is the labor negotiations conducted during the 1966–67 work stoppage. For nine months the labor negotiations were conducted at Linear by local company negotiators. When push came to shove, however, John Thomas, then executive Vice President and Secretary of Great American,[20] and Homer Weese, an officer of one of Great American's wholly-owned rubber subsidiaries, entered the negotiations on April 11, 1967 and took complete control. Indeed, they proceeded to do in one day that which Linear's local negotiators had failed to do in eight months—settle the labor dispute. Tr. at 218, 258, 362–66, 2068.

Under the circumstances one must question what, if any, actual authority, control or even input these local negotiators had concerning the labor disputes. One local negotiator, Frank Schevets, testified that

> After eight months, nine months, whatever, Mr. Weese or Mr. Thomas came in overnight, capitulated to the Union . . . we felt they capitulated because many of the items we had sought for eight or nine months to try to achieve were given away overnight.

Tr. at 1972–73. In fact, Messrs. Thomas and Weese never discussed with the local negotiators what terms they intended to agree upon before an agreement was reached. Tr. at 1974. Mr. Schevets, distressed over the terms of the agreement, testified that "we could have [capitulated] on the first day of negotiations . . . if this was the purpose, to have the plant out of business in three months, we could have done that at the first meeting." Tr. at 1973–74.

The only reasonable conclusion to be drawn under these circumstances is that Great American decided when the labor dispute would be settled and on what terms. The local Linear negotiators were simply brushed aside and the Bargaining Agreement finalized by Thomas and Weese without even consulting the local negotiators. Linear was simply given the Agreement and instructed to live with it. Tr. at 1973.

This incident is particularly relevant since Linear's local personnel told Great American officials well before the Agreement was reached by Thomas and Weese, and in no uncertain terms, that Linear could not survive such a costly settlement. Tr. at 1974. In fact, realizing that their positions hung in the balance, Linear's local management struggled for nine months to reach a labor settlement which would enable Linear to continue its operations. Tr. at 1970–71; Tr. Ex. 52. Despite the views of Linear's local people, however, those charged with the day to day operations of the plant, Great American, determined it would settle the dispute on its own terms.

---

20. Later, in 1968, Mr. Thomas became the President of Great American.

Another example of the domination and control exercised by Great American and Rubatex over Linear's local personnel is the manner in which the security agreements were executed by Linear in September, 1966. It is apparent from all the evidence before me that the impetus for elevating Rubatex to the status of a secured creditor as to Linear's antecedent debt came solely from Great American and Rubatex. Indeed, they were the only parties to benefit from the security agreements since Linear received precious little in exchange for pledging all of its assets to secure its antecedent debt.

While admittedly those individuals who executed the security agreements did so as Linear officials, they were also the officers of Great American and Rubatex in whose favor the agreements ran. It is apparent, therefore, that in executing the agreements these officers were acting for the benefit of Great American and Rubatex rather than for Linear. Consequently, the fact that they designated themselves as Linear officials is of no moment.

Concerning the Hazel Bishop affair a similar analysis obtains. It is clear that in transferring its Hazel Bishop stock to Linear, Rubatex was not attempting to bolster Linear's otherwise lackluster balance sheet. Rather, Rubatex was attempting to freeze its own losses on the stock while forcing Linear to shoulder the bulk of its bad investment. Again, the transaction demonstrates that these overlapping officers, while ostensibly acting as Linear officials, were in fact acting solely in the interest of Great American and Rubatex.

Finally, mention must be made of the manner in which Linear's assets were liquidated. At no time did any Great American or Rubatex officials attempt to establish a realistic market value for these assets. Rather, all their efforts and energies were directed toward avoiding such a valuation and deflating Linear's net worth upon termination of its operations. Again, the only conclusion to be drawn is that these officials were acting not as Linear officials or for the benefit of Linear, but rather solely for the benefit of Great American and Rubatex.

(6) The evidence further revealed that while the various financial transactions between Great American, Rubatex and Linear were separately entered on the books of the respective corporations, the precise entries in these books were dictated by Great American from its New York offices through the directives of Bernard Marren. Tr. at 956, 1102–03, 1189–95, 1245, 1429. In addition, it was the New York office of Great American (again at the direction of Marren) that decided to purchase the outstanding preferred stock of Linear and directed the movement of capital among its subsidiaries to achieve this goal. Tr. 599–601, 740–44, 719–31, 805. In short, not only were the book entries directed by Great American but capital was shuttled by Marren between the Great American subsidiaries as the need arose. Tr. 599–601.

(7) It is undisputed that at all times since its acquisition Linear had insufficient capital to conduct its business operations. Indeed, Great American and Rubatex would often be required to make payments directly to Linear's creditors to keep the rubber concern viable. For their part, however, Great American and Rubatex were often responsible for stripping this otherwise cash starved subsidiary of the few assets it possessed—e. g., the Hazel Bishop and Extruder affairs, thus insuring its absolute economic dependence and subservience to its parent and grandparent.

(8) In addition, Great American paid the salaries of at least some of Linear's officers. Tr. at 778. Likewise, it was undisputed that Great American and Rubatex paid the expenses, losses and made advances to Linear while it operated. In addition, Great American and Rubatex guaranteed all of Linear's major financing transactions. Tr. at 586.

(9) Linear was never charged, and consequently never paid, any management fees to either Great American or Rubatex for the bookkeeping and general managerial services they provided to Linear. Tr. at 780–86. This is true despite the fact that

these type of fees were charged to Great American's other subsidiaries. Tr. at 779.

(10) Great American filed consolidated tax returns and financial statements which included Rubatex, Linear and all of its other subsidiaries. Tr. Ex. 1–11; 146; 147.

(11) Finally, the total control and domination of Linear by Great American, Rubatex and Rubatex Holding is evidenced by the foreclosure and liquidation of Linear. One need not labor over the valuation and foreclosure procedures employed by Great American, nor over the reduction of debt to Great American or Rubatex to conclude that the whole process was orchestrated by Great American, and for its benefit, through the efforts of Rubatex and Rubatex Holding.

I find these facts to be more than sufficient to establish that Linear was operated as a mere instrumentality of its parent, Rubatex, and its grandparent Great American. *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 160–61 (7th Cir. 1963); *Whayne v. Transportation Management Service, Inc.*, 252 F.Supp. 573, 577 (E.D.Pa. 1966).

Concerning the second and third elements required to pierce Linear's corporate veil, the facts abound from which I find that Great American, Rubatex and Rubatex Holding through their control of, financial dealings with, and liquidation of Linear were perpetrating a fraud or working an injustice upon Local 204. I will not burden the record by repeating the facts which demonstrate the injustice in this action. Suffice it to say that these facts, fully set forth above, evidence a scheme by Great American, Rubatex and Rubatex Holding to continually increase Linear's debt to Great American and Rubatex while systematically stripping Linear of the few assets it possessed.

Moreover, it was not until September, 1966, that Great American, realizing Linear's bleak financial outlook, decided to secure its prior advances and "loans" against Linear's assets. I find that by securing these advances at the eleventh hour, Great American and Rubatex were attempting to insure recoupment of their investment at the expense of Local 204. I find their conduct in this respect to be riddled with bad faith and overreaching.[21] It is clear that given the overlapping directorates and managerial officers within the Great American complex, Great American and Rubatex were acutely aware of Linear's financial status. And it was by virtue of this inside information that Great American, through Rubatex, decided to secure all prior advances to Linear. While it is not improper for a parent or grandparent to be aware of the financial status of its subsidiary, it is improper for the parent or grandparent to use this information to gain a preference over other creditors of its subsidiary. Such conduct belies the corporate independence asserted by defendants herein. Rather, it demonstrates the absolute dominance Great American and Rubatex possessed over Linear and their willingness to use their position for their own benefit.

Indeed, their conduct was also tantamount to gaining a preference on their previously unsecured debt on the eve of insolvency. While no bankruptcy proceeding was ever instituted—voluntary or involuntary—and consequently a "preference" as defined under the bankruptcy law is technically inapplicable to the case at bar, this conduct does evince a fraudulent intent on the part of Great American and Rubatex to insure payment of its antecedent debt while avoiding Linear's Union obligations.[22]

---

**21.** It will be recalled that the financing agreements were executed by Groendyk and Marren on behalf of Linear. Tr. Exs. 17, 18, 19. These individuals, however, also served as chief executive officers of Rubatex and Great American for whose benefit these agreements were executed. It would appear, therefore, that these individuals in executing the agreements were simultaneously acting for both the debtor and creditor. This further demonstrates the way in which Linear's financial affairs were so completely controlled by Great American and Rubatex.

**22.** Indeed, it appears that Great American—foreseeing the termination of operations at Linear—intentionally stalled its labor negotiations

Finally, it is clear that Local 204 was directly injured by the conduct of Great American and Rubatex. Indeed, by increasing Linear's debt and stripping it of its assets and thereafter securing this debt, Great American and Rubatex effectively barred Local 204's participation in the liquidation of Linear for even partial satisfaction of Linear's Union obligations.

Accordingly, I find the facts support the piercing of Linear's corporate veil rendering Great American, Rubatex and Rubatex Holding liable for its labor obligations as delineated above. Consequently, having pierced the corporate veil, I need not decide United Rubber's charges of fraud and violations of Pennsylvania's bulk sales law.

In conclusion, I direct plaintiff to submit its computation of damages as directed above within thirty (30) days of this opinion, defendants having ten (10) days to respond thereto, and further direct that judgment thereafter be settled on ten (10) days' notice. The judgment shall include the following provisions:

(a) The establishment of a fund, comprised of the damages awarded herein, which is to be deposited either with the clerk of this Court or with a financial institution mutually agreed to by the parties;

(b) a detailed statement of that portion of the damage award the Union is entitled to as a result of prosecuting the instant action and any damages sustained by it as a result of Linear's breach of the Bargaining Agreement; and

(c) the appointment of an independent third party, selected by the parties or, failing that, a person designated by the Court, to insure that the Union has used its best efforts to locate those individuals entitled to share in the award and also to manage the actual distribution of the funds to these individuals.

with Local 204 long enough after it secured its debt to avoid the preference provisions of the

bankruptcy laws had an involuntary petition been filed upon the termination of operations.