Mabel WHAYNE

v.

TRANSPORTATION MANAGEMENT
SERVICE, INC.

Civ. A. No. 25891.

United States District Court
E. D. Pennsylvania.

Feb. 11, 1966.

Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Krusen, Evans & Byrne, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

The above two actions were consolidated and tried to the court on December 6–7, 1965. As shown by paragraph 3 of the Report of the Pre-Trial Conference held 12/2/65 (Document 33),[1] the issues presented for trial on December 6 were plaintiff-libellant's (hereinafter referred to as plaintiff) contention that defendant-respondent (hereinafter called defendant) operated, managed and controlled the activities in which the M. V. "Shuttler" was engaged at the time of the collision and that it was part of a transportation complex, of which the owner of the above vessel was an integral member. At the conclusion of the trial on December 7, counsel agreed to take depositions of certain witnesses to supplement the record made at the trial and these depositions are contained in Document 37.

The issue for decision now before the court is defendant's Motion to Dismiss at the Close of Plaintiff's Evidence (Document 36).[2] The plaintiff is a woman who was employed as a cook aboard the M. V. "Shuttler" (hereinafter "Shuttler"), a vessel used in towing river barges. The plaintiff alleges that on April 19, 1957, she was injured in the course of her employment when the "Shuttler" collided with a barge in the Monongahela River while en route from McKeesport, Pennsylvania, to Clairton, Pennsylvania. The plaintiff charged that the cause of her injuries was the unseaworthy condition and negligent operation of the "Shuttler" and brought these two actions, one in admiralty and one under the Jones Act. The trial has commenced with Transportation Management Service, Inc. alleging initially that it neither managed nor controlled M. V. Shuttler, Inc. to such an extent as to impose tort liability on itself under principles of respondeat superior.

Plaintiff contends that M. V. Shuttler, Inc. was so completely controlled by Transportation Management Service, Inc. that the former must be considered the agent of the latter, in which case Transportation Management Service, Inc. would have to answer for tortious conduct committed by M. V. Shuttler, Inc. or, in the alternative, that both corporations were part of a single, unitary enterprise controlled by the Leaman Estate so that their corporate entities should be disregarded.

In 1957, M. V. Shuttler, Inc. was the owner of record of the vessel "Shuttler," which was the corporation's principal asset.[3] The officers and directors of the

---

1. All document numbers refer to those assigned in Civil Action 25891.

2. This Motion is made in accordance with F.R.Civ.P. 41, which provides:
   "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief."

3. Miss Bandos testified in a deposition that the "Shuttler" was the corporation's only asset (Document 19, p. 7).
   The corporation's office at 716 Tatnall Street, Wilmington, Del., was a ghost office maintained and run by a so-called "corporation service," which forwards mail to any office designated by the corporation. Document 37, p. 4; Document 19, p. 14.

corporation in 1957 were John J. Fetsko, Elizabeth Fetsko, and Felicia L. Bandos.[4] John J. Fetsko, a resident of Florence, Alabama, was the sole stockholder of M. V. Shuttler, Inc.,[5] and was closely connected with the operation of the vessel. The plaintiff, herself, testified that on several occasions Mr. Fetsko came aboard at McKeesport and Pittsburgh, Pa., and gave orders to the vessel's engineer.[6] The testimony of Mr. Graver was that Mr. Fetsko was often aboard the "Shuttler" and may have acted as that vessel's engineer during certain periods.

The "Shuttler" was built without any "risk capital" by the Sturgeon Bay Shipbuilding and Dry Dock Company, and the Bank of Sturgeon Bay, which took a ship's mortgage on the vessel.[7] After completion sometime in 1956, "Shuttler" was engaged in towing barges on the Upper Ohio, Allegheny, and Monongahela Rivers, but not on the Mississippi.[8]

Most of the time "Shuttler" hauled barges for Lea River Lines, Inc. and Indian River Lines, Inc.,[9] but occasionally did hauling for other companies.[10]

The company that handled the paper work for M. V. Shuttler, Inc. was Transportation Management Service, Inc. (hereinafter "TMS") located at 1813 Ranstead Street, Philadelphia, Pa. TMS performed a variety of services for M. V. Shuttler, Inc., including bookkeeping,[11] preparation of tax returns,[12] maintenance of the minute book of the corporation,[13] payment of bills,[14] preparation of government licensing forms,[15] and preparation of the "Shuttler" payroll under specific instructions from Mr. John Fetsko.[16] TMS also furnished bookkeeping and similar services to companies completely independent of those corporations in which the Leaman estate had any financial interest, such as Boyer Brothers of Allentown, a plant in Frankford, the Ace Manufacturing Company and Machine Shop, Marine Transportation Company, the Pennsylvania Meat Packers Association, etc.

---

4. Document 19, p. 4.

5. Testimony of Emerson W. Graver, see notes of the court reporter.

6. Testimony of Mabel Whayne, see notes of court reporter; also, Document 38, p. 1.

7. Testimony given at the trial by Emerson W. Graver. The plaintiff urges that the reason that no risk capital was needed to build the "Shuttler" was that the C. S. Leaman interest, which owned two large river boat companies, Indian River Lines, Inc. and Lea River Lines, tacitly backed the venture from the outset, but there is little or no evidence to support this. C. S. Leaman himself died on December 13, 1955, before the "Shuttler" was built and subsequently C. E. Fernald held the controlling interest in Lea River Lines and Indian River Lines, as executor of his estate (testimony given at the trial by Emerson W. Graver and Rea Eastwood). The defendant's position is that "Shuttler" was built without risk capital because John Fetsko was a man of means and well known in the industry (testimony given at the trial by Emerson W. Graver).

8. Testimony given at the trial by Emerson W. Graver.

9. Document 37, p. 31.

10. "Shuttler" hauled barges for Ashland Oil Company and may have hauled for other companies. Document 37, p. 31. It should be noted that when Emerson W. Graver was examined on this subject he testified: "I might be able to name companies for whom they ["Shuttler"] did towing. Of course you also have to remember that there might be something like ten or twelve thousand barges on the river. I would say Ashland Oil and possibly Ohio River Company." (Document 37, p. 31).

11. Testimony of Emerson W. Graver, see notes of court reporter.

12. Document 19, p. 12 (deposition of Felicia L. Bandos taken November 17, 1959, and placed in evidence at page 25 of Document 37).

13. Document 19, p. 12.

14. Document 19, p. 13.

15. Document 19, p. 20.

16. Document 19, p. 21.

But TMS did not solicit business,[17] advertise,[18] sign purchase orders,[19] or do any buying [20] for M. V. Shuttler, Inc. Furthermore, the testimony of both Mr. Graver and Miss Bandos indicates that the movement of the "Shuttler" was in no way directed by TMS, although the offices of TMS were apparently used to transmit teletype messages from Lea River Lines, Indian River Lines, or some other company that might want to employ the "Shuttler" for hauling barges.[21] There was no testimony that TMS ever initiated these teletype messages, but only that TMS acted as a conduit for messages initiated by others.

In 1957, at the time of the accident, the directors and officers of M. V. Shuttler, Inc. were John Fetsko (President), Elizabeth Fetsko (Vice President), and Felicia Bandos (Secretary-Treasurer). The directors and officers of TMS at that time were Emerson Graver (President), Thomas Pepper (Vice President) and Felicia Bandos (Secretary-Treasurer).[22]

The sole stockholder of M. V. Shuttler, Inc. in 1957 was John Fetsko and all the stock of TMS at that time was owned by Rea Eastwood and Mrs. G. M. Fernald.[23] Thus, the only formal link between the two corporations was Felicia Bandos, who was a director and officer of both.

At the time of the plaintiff's accident, the captain on board the "Shuttler" was John P. Morris.[24] Captain Morris was responsible for rehiring [25] the plaintiff and was her immediate superior during the times she was employed aboard the vessel. The record discloses that the management and control of the vessel was exercised by Captain Morris and John Fetsko [26] and, although they in turn may have often acted in accordance with teletype messages which passed through the office of TMS, there is nothing in the record that would indicate that the "Shuttler" could move only on receipt of such teletype messages or that TMS did anything more than transmit these teletype messages originally coming from third parties.

■■ It is noted that TMS was never the record owner of the "Shuttler." That vessel was owned by M. V. Shuttler, Inc., a corporation in its own right,[27] all of whose stock was owned by John Fetsko. But the plaintiff contends that M. V. Shuttler, Inc. was so directly controlled by the "Leaman Complex," of which TMS was the dominant corporation, that TMS should be held liable here.[28]

17. Document 19, p. 19.

18. Document 19, p. 19.

19. Document 19, p. 14.

20. Document 19, p. 14.

21. Document 19, pp. 22–24.

22. Document 19, pp. 3–5.

23. Document 38, p. 3. Mrs. G. M. Fernald is the wife of Mr. C. E. Fernald; see footnote 7.

24. Document 37, pp. 5–6.

25. The plaintiff was originally hired by John Fuller (Vice President of Lea River Lines) and sent to McKeesport, Pa. to join the "Shuttler" in August of 1956. Plaintiff subsequently left the "Shuttler" in January of 1957, when the wife of Captain Morris took over the position of cook on the vessel. In March of 1957, the plaintiff was rehired by Captain Morris and was continuously on board until the accident, which was April 19, 1957.

26. John Fetsko also signed checks for M. V. Shuttler, Inc. (Document 37, pp.

22–23; Document 19, p. 13), forwarded bills (Document 19, p. 14), did the buying for the "Shuttler," and furnished information from which the payroll sheets were composed (Document 19, p. 21).

27. The plaintiff has alleged that M. V. Shuttler, Inc. did not at all times strictly adhere to the formal legal requirements demanded of a corporation. The burden of showing such failure to comply with legal requirements is on the party attacking the propriety of corporate action (see Fletcher on Corporations, §§ 4592, 433, 2010). The undersigned finds that the plaintiff has not met this burden.

28. Even accepting the plaintiff's analogy which described the "Leaman Complex" as an octopus and M. V. Shuttler a tentacle, it has not been shown that TMS was the "brain." The court suggests that TMS may have been only another tentacle.

First, the undersigned finds that there is insufficient evidence on this record to support a finding that TMS was the dominant corporation of the "Leaman Complex" and, therefore, the plaintiff must establish that M. V. Shuttler, Inc. was the "mere instrumentality" of TMS in order to hold TMS liable. Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157, 160 (7th Cir. 1963). This the plaintiff has failed to do.

Ordinarily, common directors and officers and stock control are prerequisites for the application of the "instrumentality rule." Steven v. Roscoe Turner Aeronautical Corporation, supra, at page 161. Although in the present case one officer and director, Felicia L. Bandos, was common to both companies, TMS did not control any of the stock of M. V. Shuttler, Inc.

But even assuming that the instrumentality rule applies in the present case, the plaintiff has failed to meet the test set forth with great clarity in Steven v. Roscoe Turner Aeronautical Corporation, supra, at page 160. The plaintiff must prove three elements: (1) that the parent controls the subsidiary to such a degree that the subsidiary is a mere instrumentality; (2) that the parent is perpetrating fraud or wrong through its subsidiary (e. g., torts, violation of a statute, or stripping the subsidiary of its assets); and (3) an unjust loss or injury to the claimant, such as insolvency of the subsidiary.

In determining the first of these three elements, the courts weigh many factors. Cf. Steven v. Roscoe Turner Aeronautical Corporation, supra, at page 161, and Miller v. Bethlehem Steel Corporation, 189 F.Supp. 916, 917 (S.D.W. Va.1960). In the latter case, the court pointed out that it was not the opportunity to control, but the actual control which was determinative of the issue of liability.

The factors in this case which are controlling are as follows:

1. TMS owned no stock in M. V. Shuttler, Inc. and M. V. Shuttler, Inc. owned no stock in TMS.

2. TMS and M. V. Shuttler, Inc. had only one director and officer common to both companies, Felicia L. Bandos.

3. M. V. Shuttler, Inc. regularly paid TMS for the bookkeeping and other services that TMS performed.

4. Directors' meetings of TMS and M. V. Shuttler, Inc. were held at different times and in different places.

5. The formal legal requirements of both companies were maintained at all times.

6. TMS did not direct the movement of the vessel "Shuttler."

7. TMS did not purchase any equipment or supplies used on board the "Shuttler."

8. TMS did not finance the building of the "Shuttler."

9. TMS did not hire or fire the personnel on board the "Shuttler."

10. TMS did not treat the "Shuttler" as its own.

Since the plaintiff has failed to prove the first of the three elements essential to the instrumentality rule, it is unnecessary to discuss the other two elements.

It is conceivable that the Leaman Estate might be liable here as the dominant force behind the "Leaman Complex."[29] But the Leaman Estate is not a party to

29. There were numerous overlapping and interlocking directors and officers in the "Leaman Complex." Rea Eastwood was a stockholder in TMS (50%), a director and the President of Lea River Lines and Indian River Lines, Inc. John Fuller was President of Marine Supply Co. and Vice President of Lea River Lines and Indian River Lines. Thomas Pepper was Vice President of TMS, Assistant Secretary of Lea River Lines and Indian River Lines, and Vice President of Marine Supply Co. C. E. Fernald was the executor of the Estate of C. S. Leaman, which controlled the stock of Lea River Lines and Indian River Lines. Mrs. C. E. Fernald owned 50% of the stock of TMS. Felicia Bandos was Secretary-Treasurer and a director of TMS and M. V. Shuttler, Inc.

this action and there is certainly not enough evidence on this record to support a finding that it controlled M. V. Shuttler, Inc.

Since the plaintiff has failed to prove the contention that this defendant-respondent, TMS, is responsible for the damages claimed in the Complaint and Libel, both actions must be dismissed. Although it is always unfortunate when an action has to be dismissed because instituted against a defendant-respondent which was not responsible for the alleged tort, this is not the only case where such a situation has arisen in this court. Cf., for example, Sanders, Administratrix, etc. v. Venite of Philadelphia, Inc. et al., D.C., 39 F.R.D. 55, Opinion and Order of 12/22/65; Harter v. Lestoil, Inc., Civil Action 29236, Verdict and Judgment of 1/27/66.

### ORDER

AND NOW, February 11, 1966, after consideration of the entire record in this case, including the depositions taken on December 8, 1965 (Document 37), hearings on December 6 and 7, 1965, and the briefs of counsel (Documents 38 and 40), IT IS ORDERED that the defendant's motion to dismiss made at the close of plaintiff's evidence (Document 36) is granted and the actions are dismissed with prejudice.