AKZONA INCORPORATED, a corporation of Delaware, d/b/a American Enka Company, Enka B.V., a corporation of The Netherlands and Aramide Maatschappij VoF., a partnership of the Netherlands, Plaintiffs,

v.

E. I. DU PONT DE NEMOURS & COMPANY, Defendant,

v.

AKZO N.V., Defendant on the Counterclaim.

Civ. A. No. 84–10 LON.

United States District Court, D. Delaware.

Oct. 2, 1984.

E. Norman Veasey, and R.H. Richards, III, of Richards, Layton & Finger, Wilmington, Del., for plaintiffs; Dennis McInerney, and George Wailand, of Cahill Gordon & Reindel, New York City; Robert H. Faulk, of Hubbard, Thurman, Turner & Tucker, Dallas, Tex.; C. Frederick Leydig and John E. Rosenquist, of Leydig, Voit, Osann, Mayer & Holt, Ltd., Chicago, Ill., of counsel.

Richard L. Sutton, and Jack B. Blumenfeld, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants; Joseph M. Fitzpatrick, of Fitzpatrick, Cella, Harper & Scinto, New York City; Robert C. Kline, and Donald A. Hoes, Wilmington, Del., of counsel.

## OPINION

LONGOBARDI, District Judge.

Plaintiffs, Akzona Incorporated ("Akzona"), Enka B.V. ("Enka") and Aramide Maatschappij VoF., have brought an action for a declaratory judgment that six patents assigned to E.I. Du Pont De Nemours & Company ("DuPont") relating to aramid fibers are invalid, unenforceable and noninfringed. Aramid fibers are sold by DuPont under the trade name Kevlar and by Enka under the name Enka Aramids. Plaintiffs are also seeking treble damages and injunctive relief for alleged antitrust violations and unfair competition by DuPont. DuPont has counterclaimed against Plaintiffs and Akzo N.V. ("Akzo") for patent infringement. Akzo is the sole owner of Plaintiff Enka and is the indirect owner of Plaintiff Akzona.

An earlier action in this district by Enka seeking a declaratory judgment of patent invalidity was dismissed for lack of jurisdiction. *Enka B.V. of Arnhem, Holland v. E.I. Du Pont, Etc.,* 519 F.Supp. 356 (D.Del.1981) *("Enka I").*

Currently before the Court are three motions. DuPont has admitted the Court's jurisdiction over Plaintiffs' claims regarding four of the patents but has moved to dismiss the claims concerning the other two patents. DuPont has also moved the Court to bifurcate the trial of the patent validity and noninfringement issues from the remaining issues in the case. Akzo has moved to dismiss DuPont's counterclaim against it for lack of jurisdiction.

### Background

The six patents of which DuPont is assignee are Patent No. 3,817,941 issued to Thomas I. Bair and Paul W. Morgan, Patent No. 3,819,587 issued to Stephanie Louise Kwolek, Patents Nos. 3,869,429 and 3,869,430 issued to Herbert Blades, Patent No. 3,671,542 issued to Stephanie Louise Kwolek and reissued as Re. 30,352 ("the '352 patent") and Patent No. 3,767,-756 issued to Herbert Blades ("the '756 patent"). The '352 patent covers an inter-mediate substance useful in manufacturing aramid fibers. The '756 patent covers a process for manufacturing aramid fibers. It is these latter two patents that are the subject of DuPont's motion to dismiss.

Akzo, a Dutch corporation, is primarily a holding company which also provides various financial and management services to its numerous subsidiaries around the world. Akzo does not transact or solicit any business in Delaware nor has it shipped or supplied any goods or services in Delaware. Akzo does not maintain any Delaware bank accounts, offices, telephone listing or address and is not registered to do business in Delaware. Aalders Affidavit ¶ 5.

Enka, a Dutch corporation, is a wholly-owned subsidiary of Akzo. Enka has manufactured small quantities of aramid fibers at a plant in Holland for the last several years and is now constructing a larger plant. When this plant is completed, Enka intends to sell major quantities of aramid fibers in the United States. Complaint ¶ 11 and 12. DuPont has threatened to file suit against Enka for patent infringement if it proceeds with its plans to market aramid fibers in the United States. Complaint ¶ 15.

### DuPont's Motion to Dismiss

DuPont's patent '352 covers an intermediate substance, a dope, used in the manufacture of aramid fibers and patent '756 covers a manufacturing process for these fibers. While DuPont is using those patents in the manufacture of aramid fibers in its facilities in the United States, Plaintiffs are using a similar process and substance for manufacturing aramid fibers in Holland. Plaintiffs, however, recognize the importance of the United States market and consequently are desirous of exporting their aramid fibers to the United States. It is clear from the record that Plaintiffs do not intend to use the process or the dope items covered by patents '756 and '352 in any manufacture of aramid fibers in the United States.

In moving to dismiss Plaintiffs' allegations covering these two patents, DuPont suggests that in a declaratory judgment case like this one, it is customary to test the jurisdictional basis of the claim by observing the obverse of the allegations of the complaint. In other words, if the Plaintiffs seek a declaration that Defendant's patent is invalid, the viability of the claim for jurisdictional purposes depends on whether Defendant could jurisdictionally maintain a suit against the Plaintiffs for the infringement and enforcement of its patents. Applying such logic, the question in this case is whether a district court would have jurisdiction of a lawsuit by DuPont for infringement and enforcement of its '352 and '756 patents based on Plaintiffs' manufacture of aramid fibers in Holland.

A United States patent gives the owner of the patent a monopoly of its use within the territorial limits of the United States. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527, 92 S.Ct. 1700, 1706, 32 L.Ed.2d 273 (1972). See also *Enka B.V. of Arnhem, Holland v. E.I. DuPont, Etc.*, 519 F.Supp. at 362, 369, and cases cited therein. In *Deepsouth, supra,* the Supreme Court said, "The statute makes it clear that it is not an infringement to make or use a patented product outside the United States." *Id.* at 527, 92 S.Ct. at 1706. As early as *Brown v. Duchesne*, 19 How. 183, 195, 15 L.Ed. 595 (1857), the Supreme Court determined the territorial limits of United States patents by saying:

> But these acts of Congress do not and were not intended to operate beyond the limits of the United States, and as the patentee's right of property and exclusive use is derived from them, they cannot extend beyond the limits to which the law itself is confined. And the use of it outside of the jurisdiction of the United States is not an infringement of his rights, and he has no claim to any compensation for the profit or advantage the party may derive from it.

■ It is eminently clear that under the circumstances of this case DuPont could not seek an enforcement of its patents against Enka's manufacturing activities in Europe. Consequently, the Court sees no jurisdictional basis for Plaintiffs' declaratory judgment suit which seeks resolution of the very same issues.

Alternatively, the Plaintiffs contend that this Court has pendent and/or ancillary jurisdiction over the allegations of the complaint relative to patents '352 and '756. They contend that all of the allegations against DuPont and the DuPont patents are so inextricably intertwined that they are, in effect, one cause of action.

The doctrine of pendent jurisdiction has developed through the seminal cases of *Osborn v. Bank of the United States*, 9 Wheat. 738, 6 L.Ed. 204 (1824); *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); *Moore v. N.Y. Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); and *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). It is applicable:

> ... whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority ...," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court.... The State and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

■ Even when the power to entertain pendent jurisdiction exists, whether to exercise that power is a discretionary decision to be made by the Court based on "consid-

erations of judicial economy, convenience and fairness to litigants." *Id.* at 726, 86 S.Ct. at 1139.

On the other hand, the doctrine of ancillary jurisdiction developed in situations in which the federal court had jurisdiction over a fund or property and third party interests, which would otherwise not be protected and who otherwise would not be amenable to federal jurisdiction were allowed to intervene to protect their interests. *Freeman v. Howe,* 24 How. 450, 16 L.Ed. 749 (1861); *Stewart v. Dunham,* 115 U.S. 61, 5 S.Ct. 1163, 29 L.Ed. 329 (1885); *Fulton Bank v. Hozier,* 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609 (1925).

In *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), Justice Rhenquist, speaking for the Supreme Court, refused to decide "whether there are any 'principled' differences between pendent and ancillary jurisdiction." *Id.* at 13, 96 S.Ct. at 2420. The Court, however, did recognize that a difference existed between adding causes of action in which the parties were already in federal court, when those claims arise out of a common nucleus of operative fact, and bringing into an already instituted federal suit a new party, in claims otherwise arising out of a common nucleus of operative facts. The Court, in describing the latter situation, referred to it alternatively as ancillary jurisdiction or "pendent party" jurisdiction.

██ In this case before the Court, we are not faced with bringing into this federal litigation a new party. Consequently, we are referring to pendent jurisdiction in its traditional sense. That conclusion, however, does not lead us exclusively to *Gibbs, supra,* (a typical pendent jurisdiction case) as the sole basis for deciding the issue. In explaining the differences between the two types of jurisdiction, the Supreme Court in *Aldinger* expounded on the meaning of *Gibbs.* And, therefore, *Aldinger* has meaning here.

In that case, the Court reasoned that under pendent jurisdiction there is no need to go further than the two prong test announced in *Gibbs* primarily because Con-

gress had not expressed itself to the matter of such jurisdiction. The Court recognized a legal and factual difference, however, in pendent party jurisdictional disputes. The question becomes "whether by virtue of the statutory grant of subject-matter jurisdiction, upon which petitioner's principal claim against the treasurer (the defendant in the *Aldinger* case) rests, Congress has addressed itself to the *party* as to whom jurisdiction pendent to the principal claim is sought." *Aldinger v. Howard,* 427 U.S. at 16, 96 S.Ct. at 2421. In short, when the reach of jurisdiction is extended towards a pendent party, the scope of the statute granting the federal court jurisdiction over the original claim must be examined to determine the extent of the judicial powers granted.

The legal premise of the *Aldinger* resolution of pendent party jurisdiction cannot be viewed in a vacuum and its logic must be utilized when appropriate circumstances warrant its use. And that is so whether we are talking about pendent jurisdiction or pendent party jurisdiction.

In the case before this Court, an examination of the complaint discloses that Plaintiffs really want two things with regard to patents '352 and '756. Its declaratory judgment action by obverse reasoning seeks to establish that DuPont could properly institute a suit in this federal court to prohibit Plaintiffs' manufacturing activities in the Netherlands. As indicated earlier, the Court has concluded that this Court would have no such jurisdiction. On the other side of the question, Plaintiffs want this Court to approve of their manufacturing activity implicating patents '352 and '756 because they want to export their product to the United States. In this regard, Congress has expressed a view regarding importation and the protection of such interests and has even provided a specific forum where Plaintiffs can get such relief. That forum is the International Trade Commission ("ITC"). In that forum, Plaintiffs can "question" the validity and enforceability of the '352 and '756 patents and have resolved for themselves the

real question of whether they can export aramid fibers to the United States.[1]

Even assuming that this Court had the jurisdiction to hear Plaintiffs' claims relative to the '352 and '756 patents (The Court decided otherwise. See p. 230) and that the Court could assume pendent jurisdiction (The Court has decided otherwise. See p. 231), the Court would exercise its discretion not to entertain such jurisdiction because of the pending matters before the ITC. The decision before that tribunal could very well resolve the issues presented in this case.[2] In any event, discretion dictates caution for the moment lest our exercise of respective jurisdictions entangles us in a morass of legal process. See *Stevenson v. Grentec, Inc.*, 652 F.2d 20, 211 U.S.P.Q. 1020 (9th Cir.1981), *cert. denied*, 456 U.S. 943, 102 S.Ct. 2008, 72 L.Ed.2d 465 (1982); *Ashlow Ltd. v. Morgan Const. Co.*, 672 F.2d 371, (4th Cir.1982), and *Ashlow Ltd. v. United States Intern. Trade Com'n.*, 673 F.2d 1265, 231 U.S.P.Q. 671 (C.C.P.A.1982).

For all these reasons, DuPont's motion to dismiss is granted in connection with Plaintiffs' claims regarding these patents relative to the issues of patent invalidity and enforceability.

### Defendant's Motion to Bifurcate the Trial

DuPont has moved the Court, pursuant to Fed.R.Civ.P. 42(b), for separate trials on the issues of patent validity, infringement and unenforceability and the antitrust and unfair competition claims. DuPont has further moved that all proceedings on the antitrust and unfair competition claims be stayed until after the conclusion of the trial on the patent issues.

Rule 42(b) provides that:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, crossclaim, counterclaim, or third-party claim....

■ The decision to bifurcate a trial is committed to the informed discretion of the trial judge who must evaluate the facts and circumstances of each case to determine the advisability of bifurcation. *Lis v. Robert Packer Hospital*, 579 F.2d 819, 824 (3d Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978). It is implicit in 42(b) that a trial judge who grants bifurcation has the power to limit discovery to issues relevant to the first trial. *Ellingson Timber Co. v. Great Northern Railway Co.*, 424 F.2d 497 (9th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 354, 27 L.Ed.2d 265 (1970).

■ Rule 42(b) "empowers the court to sever those issues, which, if tried with the main issues, would lead to confusion, delay, additional expense, or undue prejudice." *Value Line Fund v. Marcus*, 161 F.Supp. 533, 537 (S.D.N.Y.1958). If a case contains a large number of dissimilar and complex issues, bifurcation is often advisable in order to avoid the danger of confusing the judge or jury trying the case. *Fischer & Porter v. Sheffield Corp.*, 31 F.R.D. 534, 535 (D.Del.1962). If the trial of one issue is likely to be much shorter than the other, bifurcation can prevent unnecessary delay. *Components, Inc. v. Western Electric Company*, 318 F.Supp. 959 (D.Me.1970). Another important consideration in granting bifurcation is the extent to which determination of the issues in one case may eliminate the need for a trial on some or all of the issues in the second case. *In Re Frost Patent*, 17 F.R. Serv.2d 536 (D.Del.1973).

The Court must balance these factors favoring bifurcation against the potential for delay, additional expense or prejudice to the parties if a separate trial is granted. A significant consideration is the overlap between the issues to be proved at both

---

**1.** DuPont has already instituted such a suit involving patent '756.

**2.** Admittedly, the ITC's determination about patent validity and enforceability is not *res judicata* in a patent suit brought in federal district court pursuant to 35 U.S.C. § 271.

trials. *Brandt v. Crane,* 97 F.R.D. 707 (N.D.Ill.1983).

### Overlap in Proof

Plaintiffs have alleged that DuPont's patents are invalid and unenforceable on the grounds that (1) new matter was introduced during the prosecution of the application for the patents; (2) the patentees did not invent a new and useful composition of matter or process; (3) there were inadequate written descriptions of the inventions; (4) the claims of the patent are excessively vague and indefinite; (5) all material and substantial parts of the inventions were known, used or published in the United States before the making of the inventions; (6) all material and substantial parts of the inventions had been patented, described in a printed publication or were in public use or sale in the United States more than a year before the application for the patents; (7) the patentees were not the original inventors; (8) the subject matter of the patent would have been obvious to a person of ordinary skill in the art to which the inventions pertain at the time of the inventions; (9) the patents claim the benefit of earlier filed claims which contained inadequate written descriptions; (10) the applicants for the patents willfully, knowingly and fraudulently withheld and misrepresented material knowledge, information and data in proceedings before the United States Patent and Trademark Office; (11) DuPont coined new terms for parameters in an intentionally deceptive manner; and (12) DuPont knowingly and willfully made unlawful use of the reissue statute, 35 U.S.C. § 251, by purporting to correct an admittedly wrongful act which DuPont knew had been made with deceptive intent. Complaint ¶ 26.

Plaintiffs have also alleged that "by reason of the proceeding in the Patent Office" DuPont is estopped from asserting a construction of its patent claims which would cover any material manufactured, used or sold by Enka. Complaint ¶ 26(b).

Plaintiffs' antitrust and unfair competition claims allege that DuPont has engaged in predatory and exclusionary conduct against Plaintiffs. In this connection, Plaintiffs reallege that the applicants for the patents now held by DuPont engaged in knowing and willful fraud on the United States Patent Office. Plaintiffs add the allegation that DuPont has, in the course of obtaining its foreign patents, knowingly, willfully and fraudulently withheld and misrepresented material knowledge, information and data which was pertinent to the patenting procedure in the foreign office and which, if done in the course of obtaining patents in the United States Patent Office, would have been fraudulent. Plaintiffs further allege that DuPont has interfered with the development of a market for Enka aramids in the United States by (1) obtaining or applying for scores of United States and foreign patents in order to create a wall of patents to exclude Enka; (2) refusing to license Enka to produce aramid fibers; (3) initiating and threatening to initiate patent infringement suits against Enka customers in the United States and abroad; (4) publicizing the bringing of these lawsuits and threatening and harassing Enka customers to discourage them from dealing with Enka; (5) interfering with Enka's efforts to secure financing and thereby delaying construction of Enka's plant in Holland by fraudulent patent procurement and false statements and threats to the Dutch government; and (6) seeking to prevent Enka's production of fibers in Holland by fraud on the Dutch patent office. Plaintiffs argue that the effect of DuPont's actions is to exclude Enka as a competitor even after the patents expire. Complaint ¶¶ 27, 31–35.

Clearly, there is an overlap in proof between the patent fraud claim and the antitrust claim which is based on fraud on the United States Patent Office. However, Plaintiffs have not demonstrated that there is any other significant overlap. Also, results of any discovery on the patent fraud claim in the first trial will be available to Plaintiffs in the second trial so there need not be a duplication of discovery even on this issue. The Court, therefore, finds that while there would be some overlap in proof,

it would be a relatively small additional burden on Plaintiffs.

### Simplification of Second Trial Based on Results of First Trial

In *Walker, Inc. v. Food Machinery,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court held that a patent obtained by fraud could be the basis of an antitrust violation provided that two conditions were satisfied. First, the Plaintiff must prove that the patent was obtained through "knowing and willful fraud practiced by the defendant on the Patent Office." *Id.* at 179, 86 S.Ct. at 351 (Harlan, j., concurring). Second, the Plaintiff must prove that all of the elements needed to prove a violation of section 2 of the Sherman Act are satisfied. *Id.*

Under *Walker,* if DuPont prevails on the issue of patent validity, Plaintiffs' antitrust claim based on fraud on the United States Patent Office would have to be dismissed. Thus, at least to this extent, resolution of the issues in the first trial could be dispositive of some of the issues in the second trial.

A more difficult question is presented by Plaintiffs' claims of antitrust violations based on DuPont's foreign activities. These include the claims of fraud on foreign patent offices, interference with financing of Enka's plant and alleged instances of threats and harassment of Enka's customers abroad.

In *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir.1979), the Court extended *Walker* to cover fraud on a foreign patent office. Mannington Mills, an American flooring manufacturer, alleged that defendant Congoleum Corporation had violated United States antitrust laws by obtaining foreign patents through fraud, thereby damaging Mannington Mills' export business. The Court held that a violation of antitrust laws can be based on conduct by an American citizen overseas which is intended to have an effect on American foreign commerce and, in fact, does have a substantial effect. However, the Third Circuit went on to hold that a

court faced with an antitrust claim based on foreign conduct should balance the potential harm to international comity against the United States interest in enforcing its antitrust laws in determining whether to exercise jurisdiction.

In 1982, Congress amended the Sherman Act to clarify the jurisdiction of an American court over alleged antitrust violations based on foreign activities. Section 6a of the Sherman Act now provides:

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States, and

(2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section. If [the Sherman Act] applies to such conduct only because of the operation of paragraph (1)(b), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a (1984).

Congress was concerned that uncertainty over the applicability of the antitrust laws was inhibiting the activities of American exporters. H.R. Report 97–686, 97th Cong., 2d Sess. *reprinted in* 1982 U.S.Code Cong. & Admin.News 2431, 2487 (hereinafter cited as "House Report"). This uncertainty resulted in part from the various formulations by different courts of the standard for applicability of the antitrust laws to foreign activities. *Id.* at 2490. While there was a difference of opinion over whether the different formulations reflected substantive disagreements among the courts, Congress believed that the uncertainty itself was harmful and that,

therefore, a uniform standard was required. *Id.* at 2490–91.

Under the standard in section 6a, unless the alleged Sherman Act violation affects the import trade of the United States, the violation must have a "direct, substantial, and reasonably foreseeable" effect on domestic or export trade or commerce.

If DuPont's patents were to be judged valid and enforceable, section 6a would present an obstacle to the Court's taking jurisdiction over Plaintiffs' antitrust claims based on the foreign activities of DuPont. Under 19 U.S.C. § 1337 and 1337a, Enka's aramid fiber production could be excluded from the United States. Therefore, even if Plaintiffs' allegations concerning DuPont's foreign activities were true, they would not affect imports into the United States nor would they have a "direct, substantial, and reasonably foreseeable" effect on United States domestic or foreign commerce.

■ In response to the Court's inquiry about the effect of section 6a, Plaintiffs contended that even if DuPont's patents were judged valid, the patents might still be unenforceable due to misuse by DuPont. "Patent misuse" occurs when a patent holder attempts to extend the scope of the patent monopoly beyond its lawful limits. Examples of such misuse are attempts to fix resale prices of the patented products or tying purchases of the patented product to purchases of an unpatented product. *Rex Chainbelt, Inc. v. Harco Products Inc.*, 512 F.2d 993 (9th Cir.), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975) (tying arrangement); *Ansul Company v. Uniroyal, Inc.*, 448 F.2d 872 (2d Cir.1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972) (resale price maintenance). If there is a significant connection between the patent and the anti-competitive conduct, a court may refuse to enforce an otherwise valid patent. *Ansul Company v. Uniroyal, Inc.*, 448 F.2d at 881.

Thus, if Plaintiffs were able to prove patent misuse, DuPont would not be able to exclude Enka's products nor could DuPont maintain monopoly pricing. Therefore, section 6a would not deprive the Court of jurisdiction over Plaintiffs' antitrust claims.

In their response to the Court's inquiry Plaintiffs allege that they can prove patent misuse based on DuPont's (1) refusing to license patents unless the licensee agreed to purchase raw material from DuPont or refrain from other competition with DuPont, (2) requiring purchasers to agree to an unlawful price maintenance scheme (3) restraining competition domestically and abroad by fraudulently procuring foreign patents, and (4) threatening customers, government representatives and others to prevent them from doing business with Enka. In Enka's original complaint, however, neither these nor any other claim of patent misuse appear as grounds for invalidating DuPont's patents. Nor does the complaint contain any allegations of a tying arrangement or resale price maintenance scheme.

Even ignoring this deficiency, the allegations of patent misuse only serve to point up the potential for simplification if bifurcation is granted and the unmanageable complexity of the case if considered at a single trial. If bifurcation is granted and Plaintiffs succeed in invalidating the patents, the issue of patent misuse need not be considered. Conversely, if DuPont prevails and the patents are declared valid, then both parties will be aware that patent misuse is an essential element in establishing Plaintiffs' antitrust cause of action. This will both enhance the chances for settling the issues at the second trial and reduce confusion if the second trial does proceed.

If all issues are dealt with at one trial, however, neither the parties nor the Court will know whether patent misuse is an essential element of the case until the conclusion of the trial. Therefore, large amounts of the Court's and parties' time and resources may be expended in establishing patent misuse which later turns out to be unnecessary or in proving antitrust allegations which must later be dismissed for lack of jurisdiction. The danger of confusion and prejudice would be significantly greater than if bifurcation is granted. This

**236**

additional complication would be added to a trial that is already likely to be enormously complex.

The Court, therefore, finds that bifurcation is likely to result in considerable simplification of the issues at the second trial based on the results of the first trial.

### Potential for Delay and Prejudice

There is a strong likelihood that consideration of the patent validity issues will be delayed significantly if tried together with the antitrust issues. Major antitrust litigation is often enormously time-consuming. This is particularly likely in this case which involves allegations of several types of anti-competitive conduct in the United States and in numerous foreign countries.

The Court finds that the Plaintiffs will not be prejudiced by bifurcation. While Plaintiffs have pointed out that some important witnesses have passed the age of sixty, they have not shown that those witnesses are in poor health or are likely to be unavailable. And if and when this would become a real problem, then Plaintiffs can preserve their testimony through depositions.

For all these reasons, DuPont's motion to bifurcate the trial on the patent validity and infringement issues is, therefore, granted.

"One of the purposes of Rule 42(b) is to permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues." *Ellingson Timber Co. v. Great Northern Railway Co.*, 424 F.2d 497. Discovery will, therefore, be limited to the issues of patent validity and infringement until the conclusion of the first trial.

Obviously, there will be occasion in the near future when the parties will have a serious debate over the relevance of a particular area of discovery to the validity question. In the event those occasions do arise, the Court is available to resolve them on a case by case basis. It is acknowledged that there may be a close question of relevance to one side of the bifurcated trial as against the other side. Yes, there may be an overlap between the two in limited situations. For reference purposes, however, the parties are reminded that the Court will construe the discovery rules liberally and the parties should be guided accordingly as they attempt to resolve discovery disputes without the Court's intervention.

### Akzo's Motion to Dismiss

Akzo has moved to dismiss DuPont's counterclaim against it on the grounds that this court lacks personal jurisdiction over Akzo, that DuPont's service of process on Akzo was insufficient and that DuPont's allegations of infringement by Enka and Akzona fail to state a claim against Akzo. Since the court finds that service of process on Akzo was improper, Alzo's motion to dismiss will be granted.

### Service of Process on Akzo

DuPont attempted to serve Akzo by (1) serving in Delaware the registered agent of Akzo's wholly-owned subsidiary, Akzona; (2) by serving Akzo through the Delaware Secretary of State; and (3) by mailing process to Akzo directly in Holland. Since DuPont's cause of action for patent infringement arises under a federal statute, the jurisdiction of a federal court is determined by federal law. *Fraley v. Chesapeake & Ohio Railroad Company*, 397 F.2d 1, 3–4 (3d Cir.1968); Wright & Miller, *Federal Practice & Procedure*, § 1075 (1969). The party alleging jurisdiction has the burden of proving the facts necessary to support jurisdiction by a preponderance of the evidence. *Lucas v. Gulf & Western Industries, Inc.*, 666 F.2d 800, 805 (3d Cir.1981); *O'Neal v. Huxley Development Corp.*, 558 F.Supp. 462, 464 (D.Del. 1983). Each of DuPont's methods of service will be analyzed under these standards.

### Service on Akzona in Delaware

Rule 4(f) of the Federal Rules of Civil Procedure authorizes service of pro-

cess anywhere within the state in which the District Court is held. DuPont, however, did not serve Akzo in Delaware but its wholly-owned subsidiary, Akzona. Service on a subsidiary does not confer jurisdiction over the parent where separate corporate identities are maintained, *e.g., Lasky v. Continental Products Corp.,* 97 F.R.D. 716, 717 (E.D.Pa.1983), unless the subsidiary is found to be either the alter ego or the agent of the parent. *E.g., Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358 (10th Cir.1974).

In order to find that a subsidiary is the alter ego or instrumentality of the parent, the Plaintiff must prove: "control by the parent to such a degree that the subsidiary has become its mere instrumentality;" *Steven v. Roscoe Turner Aeronautical Corporation,* 324 F.2d 157, 160 (7th Cir.1963); *Whayne v. Transportation Management Service,* 252 F.Supp. 573, 577 (E.D.Pa. 1966); *aff'd per curiam sub nom., Whayne v. Shuttler,* 397 F.2d 287 (3d Cir.), *cert. denied,* 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 438 (1968).

▮▮▮▮ Whether a subsidiary is the agent of the parent involves a determination that the separate corporate identities of the subsidiary and parent are a fiction and that the subsidiary is, in fact, being operated as a department of the parent. *Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406, 425–26 (9th Cir.1977). The parent must have actual, participatory and total control of the subsidiary. *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil,* 456 F.Supp. 831, 841 (D.Del.1978).

In support of its contention that Enka and Akzona are agents of Akzo, DuPont points to: (1) Akzo's 100% ownership of Enka and Akzona; (2) some overlap between the board of directors and Akzo and those of Enka and Akzona; (3) references to Enka and Akzona as divisions of Akzo in the Akzo annual report; (4) deposition of current and former Enka employees in which they referred to Enka as a division of Akzo and stated that the Enka board reported to the Akzo board; (5) the requirement that Akzo approve capital expenditures by Enka and Akzona of amounts exceeding $850,000; (6) references to Akzo's board members' supervision of the "divisions"; (7) references in Akzo board meetings and in corporate reports to the development of advanced fibers as an "Akzo decision" and "Akzo project"; (8) Akzo taking credit for the advanced fiber project in its annual report; (9) Akzo's negotiation with an agency of the Dutch government to set up a joint venture with Enka to manufacture aramid fibers; (10) Akzo's guarantee of 50% of the Dutch government loans to Enka; and (11) Akzo's participation in the decision to bring this declaratory judgment action.

The court finds that Plaintiffs' allegations even viewed in their most favorable light do not establish that Enka and Akzona are the agents of Akzo. The references in the annual report to Akzo's "Enka division" do not refer to Enka B.V. but to a group of 18 companies of which Enka B.V. is just one member. The annual report makes it clear that the Enka "division" is composed of separate corporations. See Appendix to Defendant's Brief, p. 434. (page in the Akzo annual report listing the companies in the Enka divisions most with identifiers such as "ltd." or "S.A." or "B.V." indicating their separate corporate status) and p. 392 (discussing operating performance of different corporations in the Enka group). Similarly, the annual report clearly indicates Akzona's separate corporate status. See *Id.,* p. 387 (reference to acquisition of minority interest in Akzona).

▮▮▮ DuPont's citation of statements by Mr. Broekmeyer, the general manager of Enka, that "Enka is a division of Akzo" is equally unpersuasive. The choice of words of a foreign layman untutored in the subtleties of American corporate law is of little independent significance in establishing an agency relationship although it may corroborate other evidence. *Berger v. Columbia Broadcasting System, Inc.,* 453 F.2d 991, 996 (5th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972). This is particularly true in this case since Mr. Bro-

ekmeyer specifically indicated that he was confused as to the sense in which the word "division" was being used.[3] Similarly, Mr. Broekmeyer's statement that he thought the Enka board probably reported for the combined board of Akzo does not establish when and under what circumstances the Enka board reported to the Akzo board. More importantly, it does not establish the degree of control exercised by Akzo. (The allegation prompts the rhetorical question, "What is wrong with a subsidiary reporting to its parent corporation?") Indeed, Mr. Broekmeyer specifically stated, "[i]t is over my level so I don't know all the details of this, of course." Appendix to Defendant's brief, p. 473.

The remaining significant evidence consists of Akzo's 100% ownership of Enka and Akzona, the requirement that it approve capital expenditures greater than $850,000, its activities in approving the aramid project, arranging financing for it and some overlap in the board of Akzo with those of Enka and Akzona. On stronger facts than these, the court in *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil*, 456 F.Supp. 831, found no agency relationship. In *Japan Petroleum*, the parent owned 100% of the subsidiary, acted as surety on its bank loans and advanced money to the subsidiary. Further, most of the officers and directors of the subsidiary were also officers and directors of the parent or its affiliates. Even so, since the subsidiary was not a shell but an operating company which independently handled routine, day-to-day operations, maintained separate books and had significant rights and

obligations apart from its parent, the court refused to infer an agency relationship.

Similarly, in *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175 (9th Cir.), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980), the parent had "general executive responsibilities" for the operations of the subsidiary, approved major policy decisions, guaranteed the subsidiary's bank loans and worked closely with the subsidiary on approving decisions. Further, some directors of the parent served as directors of the subsidiary while the president of the subsidiary had served as a director of the parent. Despite this, the court refused to infer that the subsidiary was the alter ego or an agent of the parent.

▮ In this case, it is undisputed that both Enka and Akzona are significant operating corporations which maintain separate books, observe corporate formalities and possess assets of several hundred million dollars each. Enka and Akzona have rights and obligations separate from Akzo. DuPont has not established that Akzo interferes in the day-to-day operations of its subsidiaries but only that it oversees and approves major capital expenditures. Akzo's role in the aramid project, while significant, is not nearly as extensive as the role of the parent corporation in *Japan Petroleum*.

DuPont relies on *Tokyo Boeki (U.S.A.), Inc. v. SS Navarino*, 324 F.Supp. 361 (S.D. N.Y.1071), *United States v. Watchmakers of Switzerland Info. C.*, 134 F.Supp. 710 (S.D.N.Y.1955), *Flank Oil Co. v. Continental Oil Co.*, 277 F.Supp. 357 (D.Col.1967)

**3.** Q. Is Enka like a division of Akzo?
A. Yes, sir.
Mr. Leydig: I will object to that belatedly, in the sense that to the extent you are asking for a legal conclusion to a distinction between a division and a subsidiary, if that be the purpose of your question, I am not sure this man is qualified to answer that. He certainly may answer it.
Q. You consider Enka a division of Akzo.
A. I am a bit weighed (sic) now. If there are legal implications and your legal interpretation of a division is different than mine, I would like to refuse to answer this question.

Q. Do you refuse to answer this question?
A. Yes, sir.
Mr. Leydig: You need not refuse. If you are incapable—
A. Yes. I am unaware of what you call a division and what we call a division.
Q. Have you ever heard Enka called a division of Akzo?
A. I have.
Q. Isn't it common parlance in the Akzo group of companies to refer to Enka as a division?
A. Yes, in our sense of the word; yes, sir.
Appendix to Plaintiffs' brief, pp. A474–A475.

and *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), in which cases jurisdiction over the parent corporations was found to exist based on the activities of the subsidiary even though all corporate formalities were observed and even though the subsidiaries were significant operating companies in their own right. These cases are distinguishable, however.

In *Tokyo Boeki*, under a New York law, a Japanese manufacturing company was found to be present in New York for the purpose of asserting jurisdiction over it based on the activities of its wholly-owned American subsidiary. There, however, the subsidiary's primary responsibility was to market the Japanese parent's products in the United States and the subsidiary lacked any independent manufacturing capability. In such a case, the subsidiary is performing the same function that the manufacturer would otherwise have to perform itself in marketing its goods. See *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F.Supp. 1322, 1343 (E.D.N.Y.1981). Here, Enka is a significant manufacturing corporation. Akzona, although primarily a marketing company, cannot be viewed as the marketing department of Akzo since Akzo has no manufacturing capability.

*United States v. Watchmakers of Switzerland, supra,* involved an alleged conspiracy between a Swiss corporation and its New York subsidiary to violate the antitrust and patent laws. The court held that two corporations which conspire with each other for a criminal purpose will be held to be agents of each other, at least where they are affiliates. The authority cited by the *Watchmakers of Switzerland* court referred to this implied agency as part of "the substantive law of crime." *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir.1926). There are no allegations in the complaint in this case which would indicate applying the principles of *Watchmakers of Switzerland, supra,* as appropriate.

*United States v. Scophony Corporation of America, supra,* and *Flank Oil Co. v. Continental Oil Co., supra,* dealt with venue and service of process under section 12 of the Clayton Act. Scophony, a British television equipment manufacturer, attempted to enter the American market but, due to wartime restrictions, found that it lacked sufficient capital to proceed alone. It, therefore, entered into a complex agreement with American interests which involved the incorporation of a jointly-owned Delaware subsidiary accompanied by supplemental contractual arrangements spelling out the rights and obligations of the parties. The court found that the subsidiary was merely an alternate means for Scophony to pursue its objective of entering the American market and exploiting its patents profitably after its attempt to do so directly had faltered. The supplementary agreements provided for a degree of supervision and control far beyond that of a shareholder protecting its investment. The court, therefore, found that the activities of the subsidiary in New York were sufficient to allow venue and service of process on Scophony in that state.

The *Scophony* court had to distinguish a line of cases, such as *Cannon Mfg. Co. v. Cudahy Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), which emphasized the observance of corporate formalities in determining whether jurisdiction over the parent could be exercised based on the activities of the subsidiary. In *Cannon*, the Court found that the parent dominated the subsidiary "indirectly and completely, and exert[ed] its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches of its business not separately incorporated." *Id.* at 335, 45 S.Ct. at 251. Even so, since all corporate formalities were observed, jurisdiction over the parent could not be based on the activities of the subsidiary.

The *Scophony* Court distinguished *Cannon* on the grounds that *Scophony* arose under section 12 of the Clayton Act and that a more lenient standard for jurisdiction was necessary to effectuate the policies of the antitrust acts. 333 U.S. at 817, 68 S.Ct. at 866.

*Flank Oil Co. v. Continental Oil Co., supra,* also arose under section 12 of the Clayton Act and once again the Court distinguished *Cannon* on the grounds that the formalistic approach of *Cannon* was inappropriate in anti-trust cases. 277 F.Supp. at 364–65. DuPont relies on *Zenith Radio Corp. v. Matsushita Elec. Ind. Co., Ltd.,* 402 F.Supp. 262, 326 (E.D.Pa.), *petition denied,* 521 F.2d 1399 (3d Cir. 1975), for the proposition that "cases addressing whether the activities of a subsidiary are attributable to a foreign parent for purposes of establishing venue under the Clayton Act are equally applicable to the question whether the subsidiary's actions create personal jurisdiction over the parent." Defendant's answering brief, p. 38. This reliance, however, is misplaced. In this case, DuPont's counterclaim contains no allegations based on antitrust violations. The more liberal standards adopted by the *Zenith Radio* case under section 12 of the Clayton Act cannot be appropriately or logically applied here.

Since the facts do not support a finding that Akzona is the alter ego or agent of Akzo, DuPont's service on Akzona is insufficient to confer jurisdiction over Akzo.

### *Mailing Process to Akzo*

DuPont relies on Fed.R.Civ.P. 4(c)(2)(C)(ii) as authorizing service on a foreign corporation by mailing a copy of the summons and complaint to the person to be served. It asserts that its mailing of process to Akzo in Holland constitutes sufficient service.

Rule 4(c)(2)(C), added in 1983, deals with the manner of service not with amenability to service. Service of process must be authorized by another one of the Federal Rules of Civil Procedure. *William B. May Co. v. Hyatt,* 98 F.R.D. 569 (S.D.N.Y.1983); *San Miguel & Compania, Inc. v. International Harvester Export Co.,* 98 F.R.D. 572 (D.P.R.1983). Federal Rule of Civil Procedure 4(e) allows out-of-state service on a foreign corporation whenever authorized by a statute or court order of the United States or of the state in which the

District Court is located. Since no federal statute is applicable, sufficiency of service in this case is governed by Delaware law.

The Delaware long-arm statute, 10 *Del.C.* § 3104(c), provides as follows:

(c) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within State at the time the contract is made, unless the parties otherwise provide in writing.

Akzo is a holding company with no direct connection to Delaware at all. Since Akzona and Enka are not the alter egos or agents of Akzo, there is no basis for attributing their activities to Akzo and, therefore, none of the statutory bases for jurisdiction apply to Akzo. Therefore, mailing process to Akzo did not confer jurisdiction over Akzo on this court.

### *Service on the Delaware Secretary of State*

Title 10, section 3104(b) of the *Delaware Code* authorizes service on a nonres-

ident "who commits any of the acts hereinafter enumerated" by serving the Delaware Secretary of State. The "acts hereinafter enumerated" are those listed in section 3104(c) discussed above. Since Akzo has not committed any of those acts, service on the Secretary of State was also invalid.

### Conclusion

All of the methods of service on Akzo attempted by DuPont are invalid under applicable federal and state law. This court, therefore, lacks personal jurisdiction over Akzo and Akzo's motion to dismiss the counterclaim must be granted.

IT IS SO ORDERED.